SOUTHERN RAILWAY CO. *v.* SEABOARD ALLIED-
MILLING CORP. ET AL.

No. 78–575.   Argued April 23, 1979—Decided June 11, 1979*

*Together with No. 78–597, *Interstate Commerce Commission* v. *Seaboard Allied Milling Corp. et al.;* and No. 78–604, *Seaboard Coast Line Railroad Co. et al.* v. *Seaboard Allied Milling Corp. et al.,* also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the cases.

*Mark L. Evans* argued the cause for petitioner in No. 78–597. With him on the briefs were *Christine N. Kohl* and *James P. Tuite. Wandaleen Poynter* argued the cause for petitioners in No. 78–604. With her on the briefs were *Donal L. Turkal, Fred R. Birkholtz,* and *Richard A. Hollander. Michael Boudin* and *Clare Dalton* filed briefs for petitioner in No. 78–575.

*Richard A. Allen* argued the cause for the United States as respondent in all cases. With him on the briefs were *Solicitor General McCree* and *Deputy Solicitor General Easterbrook. John H. Caldwell* argued the cause for respondents Seaboard Allied Milling Corp. et al. in all cases. With him on the brief were *Peter A. Greene, Rufus L. Edmisten,* Attorney General of North Carolina, *Jacob Safron,* Special Deputy Attorney General, *Richard L. Griffin,* Associate Attorney General, *Theodore L. Sendak,* Attorney General of Indiana, *William G. Mundy,* Deputy Attorney General, and *Donald P. Bogard. Harold E. Spencer* argued the cause for respondents Board of Trade of the City of Chicago et al. in all cases. With him on the brief were *Thomas F. McFarland, Jr.,* and *Richard S. M. Emrich III.*†

MR. JUSTICE STEVENS delivered the opinion of the Court.

On September 14, 1977, the Interstate Commerce Commission decided not to exercise its authority under § 15 (8) (a) of the Interstate Commerce Act (Act) to order a hearing to investigate the lawfulness of a seasonal rate increase proposed by a group of railroads.[1] The question presented is

---

†*J. Raymond Clark, John L. Taylor, Jr.,* and *John R. Molm* filed a brief for Potomac Electric Power Co. et al. as *amici curiae* urging affirmance.

[1] At all relevant times, § 15 (8) provided in pertinent part:

"(a) Whenever a schedule is filed with the Commission by a common

whether the Commission's refusal to conduct such an investigation is subject to judicial review.

Because the Courts of Appeals for the Eighth Circuit, *Seaboard Allied Milling Corp.* v. *ICC*, 570 F. 2d 1349, and the District of Columbia Circuit have answered this question differ-

carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect immediately at the expiration of such time period, or shall remain in effect if it has already become effective. Such rate, fare, charge, classification, regulation, or practice may be set aside thereafter by the Commission if, upon complaint of an interested party, the Commission finds it to be unlawful.

"(b) Pending a hearing pursuant to subdivision (a), the schedule may be suspended, pursuant to subdivision (d), for 7 months beyond the time when it would otherwise go into effect, or for 10 months if the Commission makes a report to the Congress pursuant to subdivision (a), except under the following conditions . . . ." 90 Stat. 2630, 49 U. S. C. § 15 (8).

On October 17, 1978, President Carter signed into law Subtitle IV of Title 49, United States Code, "Transportation," 49 U. S. C. § 10101 *et seq.* (1976 ed., Supp. II), which recodifies and revises some of the archaic language of the Interstate Commerce Act. See Note preceding 49 U. S. C. § 10101 (1976 ed., Supp. II). Section 10707 of the recodified Title 49 corresponds to § 15 (8) of the old statute. In this opinion we shall refer to the relevant statutes by their former designations.

ently,[2] we granted certiorari. 439 U. S. 1066. We now hold that the Commission's "no investigation" decision is not reviewable.

Petitioner railroads' rate schedule was the first one proposed under § 202 (d) of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act). 90 Stat. 36, amending 49 U. S. C. § 15 (1970 ed.). See App. to Pet. for Cert. in No. 78–597, p. 28a. That provision directs the Commission to adopt "expeditious procedures for the establishment of railroad rates based on seasonal, regional, or peak-period demand for rail services."[3]

---

[2] In *Asphalt Roofing Mfg. Assn.* v. *ICC*, 186 U. S. App. D. C. 1, 8–9, 567 F. 2d 994, 1001–1002 (1977), the Court of Appeals for the District of Columbia Circuit held:

"The orders challenged in each of these proceedings permitted rates filed by the railroads to go into effect without either investigation or suspension. It is firmly settled that ICC orders suspending rate increases for the statutory period are within the agency's sole discretion and are judicially unreviewable. . . . The United States and the petitioners urge that a distinction should be drawn between Commission orders refusing to suspend rate increases and those declining to institute an investigation; the latter, they argue, should be held reviewable. The basic difficulty with this argument is that section [15 (8) (a)], which empowers the Commission both to suspend and to investigate proposed rate increases, grants both powers in substantially the same language. There is therefore no ground, on the basis of the Act, for treating the two powers differently for purposes of reviewability. We hold that the reviewability of the Commission's decision to permit the rate increases in these proceedings to go into effect without suspension or investigation is controlled by the cases holding the Commission's decision whether to suspend a rate increase to be unreviewable."

[3] Section 202 (d), codified originally at 49 U. S. C. § 15 (17) and as set forth therein, provides as follows:

"Within 1 year after February 5, 1976, the Commission shall establish, by rule, standards and expeditious procedures for the establishment of railroad rates based on seasonal, regional, or peak-period demand for rail services. Such standards and procedures shall be designed to (a) provide sufficient incentive to shippers to reduce peak-period shipments, through rescheduling and advance planning; (b) generate additional revenues for the railroads; and (c) improve (i) the utilization of the national supply of freight cars, (ii) the movement of goods by rail, (iii) levels of employ-

In August 1977, after the Commission had promulgated its new standards and procedures for seasonal rate adjustments, see *Ex parte No. 324,* 355 I. C. C. 522, the Southern Freight Association proposed a 20% increase in the rates for grain and soybeans shipped from the Midwest in railroad-owned cars between September 15 and December 15, 1977. The railroads supported their proposal with statistics describing the high volume of grain shipments in the fall, an explanation of the anticipated effect of the temporary rates on railcar usage, and some cost evidence.

A number of shippers and large users of transported grain (hereinafter shippers) filed protests claiming the proposed rates were unlawful.[4] They requested that the Commission exercise its authority under § 15 (8)(a) to suspend these rates and to investigate the charges of illegality. On September 14, 1977, a month after the rates were filed, and eight days after receiving the protests, the Commission issued its order declining either to suspend or to investigate the legality of the rates. App. 286–291.

In that order the Commission admonished the railroads "to take prompt action to remove violations of the long-and-short-haul provision of section 4 (1) of the Act, if any, in connection with inter-territorial and intra-territorial movements that may be caused by application of demand-sensitive rates on whole

ment by railroads, and (iv) the financial stability of markets served by railroads. Following the establishment of such standards and procedures, the Commission shall prepare and submit to the Congress annual reports on the implementation of such rates, including recommendations with respect to the need, if any, for additional legislation to facilitate the establishment of such demand-sensitive rates."

The provision is currently codified in 49 U. S. C. § 10727 (1976 ed., Supp. II). See n. 1, *supra.*

[4] The shippers objected to the rates as unreasonably high in violation of 49 U. S. C. § 1 (5); as discriminatory contrary to §§ 2, 3 (1), because they applied only to railroad-owned cars; as not conforming to the goals of the seasonal-rate authorization; and as violating the long-and-short-haul clause of § 4 (1).

grains between points in southern territory." *Id.*, at 288. Moreover, the Commission directed the carriers to file detailed weekly reports relating to the effects of the new schedules, *id.*, at 289–290 (and, in a later order, to keep accounts of all charges and receipts under the rates, *id.*, at 302), and "out of caution" it instructed its Bureau of Investigations and Enforcement and Bureau of Operations "to closely monitor this matter." *Id.*, at 290. With respect to the basic question whether to suspend the rates and conduct a formal investigation, the Commission concluded:

> "Weighing the contentions before us and the clear Congressional purpose to permit experimental ratemaking, we will permit this temporary adjustment to become effective." *Id.*, at 289.

It noted, however, that § 13 (1) of the Act, which allows shippers to initiate mandatory posteffective proceedings to inquire into and remedy violations of the Act, would still be available to "protect" persons aggrieved by the rates.[5] App. 289.

---

[5] Section 13 (1) provides:

"Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate

Immediately after the Commission entered its order, two judges of the Court of Appeals granted an *ex parte* application for a temporary stay and enjoined the Commission from permitting the tariff to go into effect. *Id.*, at 295. Eight days later, however, the court dissolved its stay and the new rates went into effect. *Id.*, at 298–300. Two months after the seasonal tariff had expired, the Court of Appeals filed its opinion concluding that the Commission had begun an investigation but had then erroneously terminated it without "adequately investigat[ing] the charges" of "patent illegality" and without supporting its decision "with appropriate findings and conclusions." 570 F. 2d, at 1352, 1355, 1356. It directed the Commission to hold hearings to investigate more fully the protestants' charges of patent illegality and, if the investigation revealed that the tariff was unlawful, to make appropriate provisions for refund of increased charges collected under the tariff. *Id.*, at 1356.

Although some of the just-quoted passages suggest that the Court of Appeals viewed the Commission's order as an inadequately investigated decision on the merits, other passages indicate that it reviewed and disapproved of the order, realizing that it was a decision *not* to reach the merits and *not* to investigate the lawfulness of the rates. Because the period covered by the seasonal tariff had already expired, the court first stated that it would not decide whether the Commission's refusal to suspend the effectiveness of the rates pending investigation was reviewable. *Id.*, at 1352. Assuming, however, that *United States* v. *SCRAP*, 412 U. S. 669, 698, and *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658, 667–668, had established that a suspension decision is not reviewable, the court reasoned that the Commission's suspension and inves-

the matters complained of in such manner and by such means as it shall deem proper." 49 U. S. C. § 13 (1).

This provision is currently codified in 49 U. S. C. § 11701 (b) (1976 ed., Supp. II). See n. 1, *supra.*

tigation powers are separate and distinct and that the factors that had prompted this Court in *Arrow* "to hold suspension orders not reviewable are not applicable to decisions of the Commission to refuse to make or to terminate an investigation of the lawfulness of a proposed tariff." 570 F. 2d, at 1353. It then concluded that the latter type of decision is subject to judicial review even though the former is not, primarily because, in its view, a single § 15 (8) (a) proceeding initiated by the Commission is a better means of determining the lawfulness of the rates than numerous § 13 (1) complaint proceedings initiated by shippers contending that they have been overcharged. 570 F. 2d, at 1355.

We reverse. First, to the extent that the Court of Appeals interpreted the Commission's order as a final decision that the tariff was lawful, rather than simply a discretionary decision not now to investigate its lawfulness, it has misconstrued the order. Second, to the extent that its decision transcends this misinterpretation of the Commission's order and suggests that even a "no investigation" determination would be reviewable, it has misconstrued Congress' intent with respect to § 15 (8) (a).

I

It is, of course, true that a decision by the Commission following a § 15 (8) investigation to approve or disapprove a set of rates is a judicially reviewable final decision. *E. g., United States* v. *Louisiana,* 290 U. S. 70. See *Chicago* v. *United States,* 396 U. S. 162. The shippers contend that this rule governs here. In their view, the Commission, by reviewing and then leaving intact rates it knew to be unlawful, effectively approved those rates. But the express language of the Commission's order belies any interpretation of its decision as a ruling on the legality of petitioner railroads' seasonal tariff.

The claim of illegality most forcefully urged by the shippers, both here and in the Court of Appeals, is that the schedules contain a number of violations of the long-and-short-

haul restrictions in § 4 (1) of the Act. The Commission did not reject this claim on its merits; on the contrary, it admonished the carriers to correct any such violations that might exist and directed that records be kept to protect the shippers' right to recover their damages in such subsequent proceedings as they might bring pursuant to § 13 (1) of the Act. App. 288–290. Since the Commission expressly indicated that charges of violation of § 4 (1) could be resolved in § 13 (1) proceedings, App. 289, it is plainly incorrect to interpret its action as a prejudgment of the issue.[6]

The Commission did note in addition that "the evidence offered to support the alleged [§ 4 (1)] violations [did] not warrant suspension" or investigation. *Id.*, at 288. But, in light of the nature of the inquiry that the Commission makes when a request for suspension and investigation of an areawide group of rates is filed, this, too, is clearly not a decision that there were no violations. Since 1910, when § 15 (8) (a)'s precursor was added to the Act, the Commission has typically made its suspension and investigation decisions simultaneously; indeed, the Act appears to contemplate that result. See *infra*, at 458–459. In addition, the Act leaves the Commission only 30 days to decide on suspension before the rates automatically become effective. 49 U. S. C. § 6 (3). The Commission's primary duty, therefore, is to make a prompt appraisal of the probable and general reasonableness and legality of the proposed schedule—which may, as in this case, involve thousands of rates for designated commodities and routes—rather than a detailed review of the lawfulness of each individual component of the tariff schedules.[7] In

---

[6] The analysis in text applies with equal force to the Commission's treatment of the alleged § 2 and § 3 (1) violations. See App. 288–289.

[7] Cf. *United States* v. *Louisiana*, 290 U. S. 70, 75–77; *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U. S. 289, 312–313; *United States* v. *SCRAP*, 412 U. S. 669, 692 n. 16 (even after actually investigating an areawide rate schedule and finding that it contains individually unlawful

short, the Commission simply has no time to, and did not in these cases, finally decide on the lawfulness of the rate schedule or its individual components during the preliminary 30-day period.

## II

Nor can § 15 (8) be read to tolerate judicial review of the Commission's decision *not* to investigate the lawfulness of a proposed rate schedule. Although we will not lightly interpret a statute to confer unreviewable power on an administrative agency, *Morris* v. *Gressette,* 432 U. S. 491, 501; *Dunlop* v. *Bachowski,* 421 U. S. 560, 567, we have no choice in this case. For the ultimate analysis is always one of Congress' intent, and in these cases, "there is persuasive reason to believe that [nonreviewability] was the purpose of Congress." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140.

Initially, it is important to note the extremely limited scope of the administrative decision that we conclude is not judicially reviewable. We are not here concerned with the Commission's rate-suspension authority because, as we shall see, our prior cases have already placed the exercise of that authority beyond the control of the courts. Nor, in fact, are we holding entirely unreviewable the Commission's exercise of its rate-investigation authority. For any shipper may require the Commission to investigate the lawfulness of any rate at any time—and may secure judicial review of any decision not to do so—by filing a § 13 (1) complaint. *E. g., ICC* v. *Baird,* 194 U. S. 25, 39.

Instead, our sole concern is the Commission's decision not to investigate under § 15 (8)(a), a decision that has only two final consequences. First, the burden of proof with regard to *reasonableness* is placed on the shipper under § 13 (1) rather than on the carrier, who would have borne it in a § 15 (8)(a) proceeding. (With respect to all other aspects

components, the Commission may properly approve it if the rates are "generally" lawful).

of lawfulness, however, the burden is borne by the shipper in both proceedings.)   Second, the shipper's relief, if unlawfulness is proved, is limited under § 13 (1) to actual damages rather than the full refund of overcharges available under § 15 (8)(a).   It is only with regard to these two determinations, neither of which necessarily affects any citizen's ultimate rights,[8] that we conclude—based on the language, structure, and history of the Act as well as the relevant case law—that the agency's exercise of discretion is unreviewable.

## A

With respect to the Commission's investigation power, § 15 (8)(a) is written in the language of permission and discretion. Under it, "the Commission *may,* upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of [a] rate [which] hearing may be conducted without answer or other formal pleading . . . ." (Emphasis added.)

The statute is silent on what factors should guide the Commission's decision; not only is "[t]he extent of this inquiry . . . not . . . marked . . . with certainty," cf. *United States* v. *Louisiana,* 290 U. S., at 77, but also on the face of the statute there is simply "no law to apply" in determining if the decision is correct.   Cf. *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U. S. 402, 410.[9]   Similar circum-

---

[8] If a shipper proves that a rate is unreasonable and that he was damaged in the full amount he was overcharged, the outcome of a § 13 (1) proceeding will be no different than that of a § 15 (8)(a) proceeding in which the carrier fails to establish the reasonableness of the rate.

[9] Our cases foreclose requiring the Commission to disapprove, much less to investigate, every rate schedule that can be shown to include some individually unlawful rates. *E. g., United States* v. *Louisiana, supra,* at 75–77.   The standard proposed by the Court of Appeals, which would require an investigation if individual rates are "patently illegal," is equally foreclosed by those cases.   Moreover, like the standard proposed by the Solicitor General, Brief for United States 34 (review for "abuse of discre-

stances have been emphasized in cases in which we have inferred nonreviewability. See *Barlow* v. *Collins,* 397 U. S. 159, 166; *Schilling* v. *Rogers,* 363 U. S. 666, 674.

## B

The structure of the Act also indicates that Congress intended to prohibit judicial review. Congress did not use permissive language such as that found in § 15 (8)(a) when it wished to create reviewable duties under the Act. Instead, it used mandatory language, and it typically included standards to guide both the Commission in exercising its authority and the courts in reviewing that exercise. In particular, § 13 (1), which plainly authorizes rate-investigation decisions that are reviewable, *ICC* v. *Baird, supra,* at 39, provides that "[i]f . . . there shall appear to be any reasonable ground for investigating said complaint, it *shall* be the duty of the Commission to investigate the matters complained of . . . ." (Emphasis added.) The Court of Appeals' interpretation therefore treats § 15 (8)(a) as if it were written in the mandatory language of § 13 (1).

Of even greater significance, that interpretation would allow shippers to use the open-ended and ill-defined procedures in § 15 (8)(a) to render obsolete the carefully designed and detailed procedures in § 13 (1). For under the court's reading, at least when one of the perhaps thousands of rates in a proposed schedule is "patently illegal," any party could (and, given the burden-of-proof and remedial advantages, many surely would) force the Commission immediately to undertake an investigation under § 15 (8)(a) and to reach a judicially reviewable decision on the legality of the rates. Nothing would be left for consideration under § 13 (1). We, of course, are reluctant almost a century after the Act was passed to

tion or [action] contrary to [Commission's] statutory mandate"), it is entirely without support in the statute.

adopt an interpretation of it that would effectively nullify one of its original and most frequently used provisions.

The disruptive practical consequences of such a determination confirm our view that Congress intended no such result. The Commission reviews over 50,000 rate-schedule filings each year; many, including the one involved here, contain thousands of individual rates. See 91 ICC Ann. Rep. 113 (1977). If the Commission, which generally makes its § 15 (8)(a) investigation decisions within 30 days in order to allow *pre*-effective suspension, must carefully analyze and explain its actions with regard to each component of each proposed schedule, and if it must increase the number of investigations it conducts, all in order to avoid judicial review and reversal, its workload would increase tremendously.

These practical effects of reviewability would be especially disruptive in the present context of seasonal rates proposed under § 202 (d) of the 4-R Act. The policies underlying that provision favor greater freedom of action by the railroads, greater rate flexibility, especially with respect to short-term rates, and more limited supervision by the Commission[10]—all of which would be disserved if the courts may examine the Commission's initial investigation decisions with respect to temporary rate adjustments. Furthermore, an increase in the number of rate investigations in which the railroad, rather than the challenging party, bears the burden of proof and

---

[10] In its declaration of policy with respect to the Title of the 4-R Act that included the precursor of § 202 (d), the Senate Report on that Act stated:

"[T]he purposes of [the Title] include fostering competition among all carriers in order to promote more adequate and efficient transportation and the attractiveness of rail investment, permitting greater railroad price flexibility, promotion of a rate structure more sensitive to variations in demand and separate rates for distinct services, formulation of standards and guidelines for determining adequate revenue levels, and modernizing and clarifying the functions of rate bureaus." S. Rep. No. 94-499, p. 45 (1975). See also *id.*, at 15 (primary purpose of the 4-R Act amendments was to end "excessive regulatory delay"); n. 3, *supra*.

in which the challenger need not prove actual damages before recovering refunds would be out of place in a regulatory system that leaves "the initiative in setting rates . . . with the railroad." *Aberdeen & Rockfish R. Co.* v. *SCRAP,* 422 U. S. 289, 311.

There is an additional structural reason why the Commission's investigation decisions are unreviewable. Section 15 (8) was originally included in the Mann-Elkins Act of 1910, 36 Stat. 552. As adopted, and as it has remained during the ensuing 70 years, the provision has given the Commission the power not only to investigate but also to suspend proposed rates. 49 U. S. C. § 15 (8)(b). Congress phrased the two powers in precisely the same language and placed the same time limits on the exercise of both. See *Asphalt Roofing Mfg. Assn.* v. *ICC,* 186 U. S. App. D. C. 1, 8–9, 567 F. 2d 994, 1001–1002 (1977); n. 2, *supra.* The two powers are inextricably linked because the Commission has no occasion to suspend a rate unless it also intends to investigate it. See *United States* v. *Chesapeake & Ohio R. Co.,* 426 U. S. 500, 512–513 (*Chessie*).

In view of this linkage, we need look no further than our previous decisions concluding that the merits of a suspension decision are not reviewable to find a sufficient answer to the question presented in these cases. *Aberdeen & Rockfish R. Co.* v. *SCRAP, supra,* at 311; *United States* v. *SCRAP,* 412 U. S., at 691–692, 698; *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658.[11] Indeed, if any distinction is to be

---

[11] See also *Trans Alaska Pipeline Rate Cases,* 436 U. S. 631, 638–639, n. 17. In those cases, the Court reaffirmed the conclusion in *Arrow* and the *SCRAP* cases "that courts may not independently appraise the reasonableness of rates"—*i. e.,* the merits—in reviewing suspension decisions. It did, however, "conclude that Congress did not mean to cut off judicial review for [the] limited purpos[e]" of deciding whether the Commission had jurisdiction to suspend the rates in question, *i. e.,* whether they were "new rates" within the meaning of § 15 (8)(a). See also *Schilling* v. *Rogers,* 363 U. S. 666, 676–677 ("different considerations" apply to

drawn, it would make more sense to subject suspension rather than investigation decisions to review, for the pre-effective suspension of a new rate has a greater and more immediate impact on carriers and shippers than does the initiation of an investigation whose outcome is inevitably in doubt. See *Trans Alaska Pipeline Rate Cases,* 436 U. S. 631, 641; *Chessie, supra,* at 513.[12]

## C

The legislative history of the Mann-Elkins amendments to the Act also supports nonreviewability. Prior to the enactment of those amendments, the Commission had no authority to suspend rates, or to adjudicate their lawfulness in advance either of their becoming effective or of their being challenged by a private party in a § 13 (1) complaint. In the years immediately preceding the enactment of the amendments, rapidly rising rates encouraged shippers, with some success, to ask the courts to enjoin unlawful rates before they went into effect. As a result of the ensuing judicial intervention in the

---

the reviewability of an agency "refus[al] or fail[ure] to exercise a statutory discretion" than to the reviewability of its decision once it does exercise that discretion). Here, it is conceded by all that the Commission has authority with respect to rates such as those at issue either to suspend (or investigate) or not to suspend (or investigate) them and that it has exercised its authority. The question raised is whether it did so correctly under the particular circumstances involved—a question that cannot be answered by a reviewing court without "independently apprais[ing] the [lawfulness] of [the] rat[e]."

[12] Similarly, the situation in *Arrow,* in which the courts first held a "no suspension" decision unreviewable, was far more conducive to a finding of reviewability than the situation presented by these cases. For in *Arrow,* the parties seeking judicial intervention were competitors of the railroads alleging predatory pricing, rather than shippers alleging excessive pricing. As such, it was uncertain—and the Court expressly refused to decide—whether those complainants had access to the posteffective judicial remedies that are available to shippers such as respondents here. See 372 U. S., at 669. In short, it was possible in *Arrow,* but not here, that nonreviewability would leave the aggrieved party without any judicial remedy at all.

ratemaking process, the Commission was divested of much of its primary jurisdiction with respect to rates, and the public was subjected to nonuniform rates that depended on whether or not the local district court had issued an injunction. See 21 ICC Ann. Rep. 9–10 (1907); 22 ICC Ann. Rep. 10–12 (1908); 23 ICC Ann. Rep. 6–7 (1909).[13]

As discussed at greater length in *Arrow, supra,* at 662–672, the adoption of § 15 (8) was designed to avoid these disruptive consequences of judicial interference. If we should now allow the courts to review § 15 (8) investigation decisions, we would be giving "backhanded approval" to these very same consequences. 372 U. S., at 664. Judicial review would once again undermine the Commission's primary jurisdiction by bringing the courts into the adjudication of the lawfulness of rates in advance of administrative consideration. As we said in *Arrow* with respect to judicially mandated rate suspension:

> "A court's disposition of an application for [an order directing the Commission to investigate rates] would seem to require at least some consideration of the applicant's claim that the carrier's proposed rates are unreasonable [or otherwise unlawful]. But such consideration would create the hazard of forbidden judicial intrusion into the administrative domain." *Id.,* at 669–670.

Moreover, this allowance for independent judicial appraisal of the reasonableness of rates by every court of appeals in the country might replicate the judicially created "hazard[s] to uniformity" that, along with the courts' assault on the Commission's primary jurisdiction, prompted Congress to pass § 15 (8) in the first place. See 372 U. S., at 671.[14]

---

[13] See generally 1 I. Sharfman, The Interstate Commerce Commission 49–55 (1931); Spritzer, Uses of the Summary Power to Suspend Rates: An Examination of Federal Regulatory Agency Practices, 120 U. Pa. L. Rev. 39, 45–49 (1971).

[14] Although most of the debate surrounding the relevant portions of the Mann-Elkins Act was concerned with the suspension power, it is absolutely

## D

Given the strength of the statutory and legislative evidence supporting nonreviewability, it is not surprising that prior to 1977 no court had ever even adverted to the possibility of reviewing a "no investigation" decision under § 15 (8)(a). Nonetheless, this Court has indicated on at least two occasions that the decision whether the Commission should commence an investigation under an analogous provision in the Act, § 13a (1), is committed to the agency's discretion and therefore not reviewable.[15]

---

clear both that Congress intended to commit that power to the unfettered discretion of the Commission and that it perceived it and the investigation power as closely linked. *E. g.*, S. Rep. No. 355, 61st Cong., 2d Sess., pt. 1, p. 9 (1910); 45 Cong. Rec. 3472 (1910) (Sen. Elkins); *id.*, at 462 (transmittal message of Pres. Taft).

[15] Title 49 U. S. C. § 13a (1) provides in relevant part:

"A carrier . . . may, but shall not be required to, file with the Commission . . . notice at least thirty days in advance of any . . . proposed discontinuance or change [in service]. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph . . . . Upon the filing of such notice the Commission *shall have authority* during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by order served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of opera-

In *Chicago* v. *United States*, 396 U. S. 162, the Court held that orders discontinuing § 13a (1) investigations into the propriety of certain changes in passenger service were reviewable rulings on the merits. In so holding, however, the Court expressly distinguished a Commission decision on the question whether an investigation should be undertaken in the first place, saying:

> "Whether the Commission should make an investigation of a § 13a (1) discontinuance [of passenger service] is of course within its discretion, a matter which is not reviewable. *New Jersey* v. *United States*, 168 F. Supp. 324, aff'd, 359 U. S. 27." 396 U. S., at 165.

In the *New Jersey* case cited in *Chicago*, a three-judge District Court had squarely held that the Commission's refusal to commence a § 13a (1) investigation into a railroad's abandonment of service was not reviewable. See 168 F. Supp. 324, 328 (NJ 1958). Our summary affirmance of that holding in 359 U. S. 27, while having less precedential value than an opinion in an argued case, was nonetheless a ruling on the merits, *Hicks* v. *Miranda*, 422 U. S. 332, and it, along with the *Chicago* dictum, strongly supports the nonreviewability of § 15 (8)(a) investigation determinations.

In short, the necessary " 'clear and convincing evidence' that Congress meant to prohibit all judicial review" of the Commission's limited decision not to initiate an investigation under § 15 (8)(a) is provided by the language of the statute, as well as its place within the statutory design of the Act, its legislative history, and the light shed on it by our case law concerning analogous statutes. *Dunlop* v. *Bachowski*, 421

---

tion or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order." (Emphasis added.)

This provision, it should be noted, closely parallels § 15 (8) (a). Both use permissive language and both grant the Commission mutually supportive investigation and suspension powers.

U. S., at 568. See *Abbott Laboratories* v. *Gardner,* 387 U. S., at 141.

### III

We also find no statutory support for the Solicitor General's belated compromise position that, while not immediately reviewable (*i. e.,* not "final" at the stage of the administrative proceedings involved in these cases), the Commission's decisions under § 15 (8)(a) do become reviewable later, upon the completion of whatever proceedings may be initiated under § 13 (1).[16] Under this novel reading of the Act, if a shipper is denied § 13 (1) relief, he not only may appeal that decision to a court of appeals but also may appeal the Commission's earlier decision not to suspend or investigate a rate under § 15 (8)(a).

Although it is true that the § 13 (1) remedy lessens the risk of harm from the Commission's initial refusal to investigate or to suspend under § 15 (8)(a), *Aberdeen & Rockfish R. Co.,* 422 U. S., at 311, it is nonetheless clear that that remedy is independent of § 15 (8)(a) proceedings. First, the language of § 15 (8)(a) suggests no linkage to § 13 (1) nor any basis for judicial review at *any* point in the administrative process. Second, § 13 (1) has been an independent and self-contained procedure since the Act was first passed in 1887. When § 15 (8)(a) was added some 23 years later, there was no indication that it was intended as an *amendment* to § 13 (1), rather than as a limited pre-effective and Commission-initiated *alternative* to the posteffective and shipper-initiated procedures in § 13 (1). Third, if shippers are encouraged in every case to request investigations under § 15 (8)(a) in order to preserve for later review under § 13 (1) a claim that one was not conducted, and if the Commission's decisions are ultimately subjected to review, many of the practical problems

---

[16] The United States did not take this position in the Court of Appeals, nor, so far as we are advised, has this position previously been advanced to any federal court.

that we discussed above with respect to the Court of Appeals' approach would still arise.

In sum, the force of the arguments against reviewability of § 15 (8) (a) investigation decisions is not diminished by altering the point in the administrative process at which the courts are allowed to intrude.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.