# MURRAY OHIO MANUFACTURING COMPANY

v.

# The LOUISVILLE AND NASHVILLE RAILROAD COMPANY.

No. 80–1031.

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 22, 1980.

**180**

Wilson Sims, Nashville, Tenn., Donald G. Avery, Washington, D. C., for plaintiff.

R. Lyle Key, member of the L & N Law Dept., Gareth S. Aden, Nashville, Tenn., for defendant.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiff has moved the Court for a temporary restraining order to enjoin defendant from ceasing its "Trailer-On-Flat-Car" and "Container-On-Flat-Car" service to Lawrenceburg, Tennessee, which was scheduled to cease on August 15, 1980. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1337. The Court conducted a hearing on August 15, 1980, at the close of which defendant was enjoined from ending its "piggyback" service to Lawrenceburg until the Interstate Commerce Commission [ICC or Commission] acts on the merits of plaintiff's complaint. This memorandum and written order are entered pursuant to Rule 65(d), F.R.Civ.P.

*Facts*

This case involves a particular form of railroad transportation known as "Trailer-On-Flat-Car" and "Container-On-Flat-Car" service, commonly referred to as "piggyback"[1] service. The L&N inaugurated this service to Lawrenceburg, which lies off of the railroad's main line, in 1966. In March, 1980, the railroad advised Murray that it intended to close the Lawrenceburg TOFC/COFC "ramp," thereby ending the piggyback service.[2] On July 15, 1980, L&N published Tariff Supplements effective August 15, 1980, formally announcing that the piggyback service to Lawrenceburg would no longer be available. Murray filed a protest with the ICC pursuant to 49 U.S.C. § 10707, asking the Commission to suspend and investigate L&N's closing of the Lawrenceburg ramp. On August 12, the Commission voted not to suspend or investigate under 49 U.S.C. § 10707, a decision which was appealed to a three-member division of the ICC. On August 14, this division denied the appeal, thereby terminating the administrative remedies available to suspend the tariff prior to a hearing on its merits.

In the meantime, Murray filed this action in district court on August 13, including a request for a temporary restraining order against L&N. The Court set a hearing on the motion for August 15, the effective date of the tariff, and signed an agreed temporary restraining order that insured the continuation of piggyback service through that day.

At the August 15 hearing, the Court heard testimony from two witnesses for Murray. L&N presented no proof. The first witness was Mr. Bob Flesher, Sr., Senior Executive Vice-President of Murray, and the officer in charge of Murray's transportation and distribution operations. Mr. Flesher testified that Murray, a manufacturer of bicycles and lawnmowers, had sales of $327 million last year, which resulted in a

---

1. By the term "piggyback service," the Court is referring to both "Trailer-On-Flat-Car" and "Container-On-Flat-Car" service, although technically only the TOFC service is called piggyback service.

2. It should be noted that this termination is not an abandonment under the Interstate Commerce Act, thus the procedures required when a railroad abandons a line are not applicable in this situation.

$3.8 million profit. During "peak" periods, Murray employs 4,000 workers, though at this time that figure is down to 2,300. Last year's payroll in Lawrence County amounted to $40 million. The Lawrenceburg plant is the sole manufacturing facility for Murray, which sells its products to major national retailing chains such as Sears-Roebuck, K-Mart, J.C. Penney, and Western Auto.

Mr. Flesher's testimony convinced the Court that his company is extremely dependent on piggyback service. Murray ships approximately half of its goods by truck from Lawrenceburg, while the other half moves by rail. Of the fifty percent transported by rail, approximately half is transported by piggyback service, while the other half moves in boxcars. In sum, Mr. Flesher testified that twenty-two percent of Murray's goods are transported by piggyback, and Murray's utilization of the service has grown every year. For 1980, this twenty-two percent figure represents 3,200 trailers or containers shipped by flatcar from Lawrenceburg. Piggyback is by far the cheapest form of transportation, and customers who can utilize piggyback transportation insist on it.[3] For example, in order to transport a bicycle to Chicago, it would cost $1.11 to ship piggyback, $1.62 to ship by boxcar, and $1.94 to move the bicycle by truck.

According to Mr. Flesher, the true importance of piggyback service cannot be measured by the twenty-two percent of all Murray goods that move by piggyback. This is because Murray sells most of its goods through means of nationwide contracts with the major retailing chains listed above, and without the savings made possible by piggyback, Murray would likely lose some of these contracts. Murray's competitors are, for the most part, located closer to the major markets for Murray's goods, and thus a customer's shipping costs tend to be lower when dealing with Murray's competitors. Moreover, Murray's competitors still enjoy piggyback service, which would make these competitors even more attractive to potential customers who would no longer benefit from Murray's piggyback service. In other words, even though piggyback service would transport only a portion of the goods in a given contract, the absence of piggyback service could cause Murray to lose the entire contract.

The railroad did not offer proof that its piggyback service to Lawrenceburg[4] is unprofitable, nor has that representation ever been made to Murray. Indeed, in 1979 the L&N upgraded the capacity of the Lawrenceburg ramp from eight cars to sixteen cars. The L&N has never complained to Murray about a lack of utilization of the service. However, in September 1979, L&N told Murray that a study would be done on all of L&N's off-main track ramps, and in February an L&N official told Murray that the ramp would be closed. He could offer no specific conclusions about the Lawrenceburg ramp, and the results of this study have never been made known to Murray.

Should the service terminate, Murray's alternative is to transport all of its piggyback goods by truck to Nashville, where the nearest piggyback ramp is located.[5] This would raise shipping costs substantially, and could lead to loss of business contracts, as discussed above. A more immediate problem, however, is the basic question of whether L&N could even provide the service at Nashville. According to Mr. Flesher, L&N officials at the Radnor Yard in Nashville (the location of the ramp) have expressed serious doubts that they could handle the business from Lawrenceburg. In short, the unrefuted testimony of this witness raised serious doubts about the

---

3. All of Murray's goods are shipped FOB Lawrenceburg, and thus Murray's customers pay for the shipping costs. Of course, these freight costs are considered when a customer is deciding whether to enter a contract with Murray, as will be discussed in text.

4. Murray is not the only user of the Lawrenceburg ramp, but its use is greater than that of all the other shippers who use the ramp combined. There are at least eight other companies that regularly use the ramp.

5. The one way distance to Nashville is 71 or 79 miles, depending on the route chosen.

physical feasibility of the alternative suggested by the railroad, much less its economic feasibility.

Murray's second witness was Mr. Thomas Crowley, a professional economist who specializes in transportation economics. Applying accepted principles of "cost methodology" to L&N's Lawrenceburg operation, Mr. Crowley determined that L&N is making money on the Lawrenceburg piggyback service. However, it is apparently L&N's position that the equipment used in the Lawrenceburg operation can be more profitably utilized in other service, as yet unspecified.[6] In response to this position, Mr. Crowley testified that even if there is a more profitable use that could be made of L&N's equipment, that is no reason to cut off the profitable service to Lawrenceburg; the better solution would be to acquire more flatcars and operate both profitable services. Mr. Crowley's direct testimony was not seriously attacked in cross-examination, nor did L&N answer him with its own witnesses. His testimony ended the proof offered at the August 15 hearing.

## Discussion

■ Before discussing the peculiar questions relating to a district court's power to issue an injunction in this type of case, the Court finds that Murray has satisfied the ordinary requirements for injunctive relief. Murray has shown a substantial likelihood that it will prevail on the merits of its claim that L&N's withdrawal of piggyback service would violate the railroad's duty under 49 U.S.C. § 11101 to provide service "on reasonable request." It must be emphasized that Murray presented very persuasive proof that L&N is making money on the Lawrenceburg ramp, and this testimony was completely unrefuted. Although it is up to the Commission ultimately to decide what reasonable service is in this context, as a preliminary matter this Court concludes that a profit-making rail service has a substantial likelihood of being found

reasonable, in the absence of any proof to the contrary. Of course, it may turn out that there are reasons why the Lawrenceburg service is not reasonable even though it makes a profit, but if there are such reasons, no hint of their existence was offered at the August 15 hearing. Thus, the Court accepts Murray's showing that it has a substantial likelihood of prevailing on the merits before the ICC.

Mr. Flesher's testimony clearly established the irreparable injury that would occur unless this injunction issues. There is a significant possibility that Murray will lose major contracts if the piggyback service is lost, and there would be no effective means of compensating this loss with money damages because it would be impossible to tell how many contracts were actually lost because of the discontinued piggyback service. Given the proof at the hearing, it is also clear that the threatened injury to Murray far outweighs whatever damage this injunction might cause L&N. Murray has shown that a great interference with its operations will follow if the injunction does not issue, while L&N has shown absolutely no likelihood of injury if the injunction is granted. The proof also showed that if the public interest is at stake in this proceeding, an injunction would benefit that interest. For all of these reasons, the Court concludes that injunctive relief is appropriate.

■ However, even though the usual requirements for injunctive relief have been satisfied, this case presents difficult questions regarding this Court's power to issue an injunction under the circumstances presented. The L&N argues, quite accurately, that ICC decisions not to investigate and suspend under 49 U.S.C. § 10707 are not subject to judicial review. *Southern Railway Co. v. Seaboard Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979) (construing former 49 U.S.C. § 15(8), the predecessor to section 10707). The railroad argues further that Murray's district court action is simply an indirect means of

---

**6.** This was at least the position of L&N in its reply to Murray's petition for suspension in the proceedings before the ICC. This reply is Exhibit D of Murray's Verified Complaint in this Court.

obtaining judicial review, and thus this action should be barred by the *Southern Railway* holding. Although this argument was initially well-taken, the Court is now satisfied that this proceeding in no way involves a judicial review of the Commission's unreviewable decision not to investigate and suspend. Indeed, the Court further concludes that the analysis in *Southern Railway* supports the view that a district court has the power to issue an injunction to maintain the status quo pending a section 11701 complaint proceeding after a plaintiff's unsuccessful attempt to initiate suspension and investigation proceedings under section 10707, as in this case.

In *Southern Railway* a number of shippers and large users of transported grain filed protests with the ICC after certain railroads had proposed a seasonal increase in the rates for grain and soybean shipments. The Commission declined to investigate and suspend, and the shippers then applied to the Eighth Circuit for a stay. On appeal, the Supreme Court held that the Commission's decision was not reviewable in the court of appeals.

There were essentially two basic reasons for this decision. First, the Commission's discretionary "decision" not to suspend and investigate was not a final determination that the proposed tariff was lawful, and to the extent that the Eighth Circuit had concluded that it was a final decision, the court was mistaken. 442 U.S. at 452, 99 S.Ct. at 2393. The Commission's decision cannot be regarded as a final determination, because the ICC simply has no time to decide on the lawfulness of a rate during the thirty-day period provided by statute. *See* 49 U.S.C. § 10762. Second, even if the decision not to investigate was a final decision, it was Congress' intent that this decision not be reviewable. 442 U.S. at 454, 99 S.Ct. at 2394. Nonreviewability is inferred from the statute's silence as to what factors should guide the Commission's decision, because there is "no law to apply" in determining whether

the decision was correct. *Id.* at 455–56, 99 S.Ct. at 2394–2395. The structure of the Act also indicates Congressional intent to prohibit judicial review. The Court reasoned that if the Commission's discretionary decision not to suspend and investigate under the former section 15(8)(a) was reviewable, there would be no purpose in section 13(1), now section 11701, complaint proceedings, in which the Commission is required to investigate the source of the complaint, but with the burden of proof shifted to the complaining shipper. *Id.* at 456–57, 99 S.Ct. at 2395. If such decisions were reviewable, it would greatly increase the Commission's workload, since the ICC would have to carefully analyze and explain its no-suspension decisions in order to avoid judicial reversal. *Id.* at 457, 99 S.Ct. at 2397. These "disruptive practical consequences" confirm the Court's view that Congress intended no such result.

Finally, the Court looked at the legislative history of the Mann-Elkins amendments to the Act, which first authorized the Commission to suspend rates. Mann-Elkins Act of 1910, 36 Stat. 552. Prior to these amendments, shippers had enjoyed some success in asking courts to enjoin unlawful rates before they went into effect. This judicial intrusion divested the Commission of much of its primary jurisdiction to regulate rates, and created nonuniformity of rates. The adoption of section 15(8) was designed to avoid these disruptive consequences, *id.* at 460, 99 S.Ct. at 2397, and the Court reasoned that judicial review of decisions not to investigate and suspend would be giving "backhanded approval" to the same consequences that were the target of the Mann-Elkins amendments. *Id.*

The question now presented in this case is whether a district court may grant an injunction once section 10707 relief has been denied by the ICC.[7] In *Southern Railway,* the Supreme Court clearly condemned "judicial intrusion into the administrative do-

---

7. The doctrine of primary jurisdiction requires a district court to deny injunctive relief unless a party has first applied to the ICC for relief under the investigation and suspension provi-

sions of section 10707. *See Elgin Coal Co. v. Louisville & Nashville Railroad Co.,* 411 F.2d 1043, 1045 (6th Cir. 1969).

main," *id.* at 461, 99 S.Ct. at 2397, in advance of the appropriate administrative consideration. The danger presented by such judicial interference is the threat of nonuniformity from district to district or from circuit to circuit, because the courts, rather than the ICC, would be passing on the merits of rate increases. Thus, in *Southern Railway,* the Eighth Circuit's decision that a denial of section 15(8) relief was reviewable would have resulted in the Eighth Circuit passing on the merits of a rate increase before the ICC ever had an opportunity to do so. This is much different from the situation presented in the instant case, however, because the legality of L&N's tariff will be determined by the ICC in the exercise of its primary jurisdiction, as it should be.[8] Of course, it is true that this Court has to look at the merits of Murray's claim before granting injunctive relief, but in this situation that judicial appraisal does not affect the ICC's primary jurisdiction, because this Court is not deciding that the tariff was illegal, or that the ICC acted inappropriately in refusing to suspend this tariff. There is no threat of nonuniformity, because even though this Court has temporarily enjoined the operation of the tariff at issue, the merits of L&N's proposal will still be decided by the ICC in the first instance.

The Supreme Court's other major concern in *Southern Railway* was the tremendous increase in the ICC's workload that would result should the Commission's decision not to investigate be reviewable. *Id.* at 457, 99 S.Ct. at 2395. The Commission reviews 50,-000 rate-schedule filings each year, and if each of these decisions were reviewable, one may safely assume that the extra work required in order to avoid judicial reversal would be an enormous, if not indeed a crippling, burden. Obviously, this Court's granting of injunctive relief to maintain the status quo does not have that effect. No burden is placed on the ICC if a district court acts to maintain the status quo pending agency action, because there is no sense in which the ICC is required to justify its actions.

That the district court has the power to maintain the status quo in the situation presented by the instant case is further supported by the Supreme Court's observations about the nature of the Commission's decision not to investigate. The Court noted that the Commission's "primary duty" in deciding whether to investigate "is to make a prompt appraisal of the probable and general reasonableness and legality of the proposed schedule . . . rather than a detailed review of the lawfulness of each individual component of the tariff schedules." *Id.* at 453, 99 S.Ct. at 2393 (footnote omitted). The Commission's action does not constitute any sort of final decision on the lawfulness of a rate schedule, *id.* at 454, 99 S.Ct. at 2394, nor could it, given the 50,000 rate-schedule filings each year, many of which "contain thousands of individual rates." *Id.* at 457, 99 S.Ct. at 2395. These considerations led the Supreme Court to conclude that a decision not to investigate and suspend is not reviewable, and the same considerations lead this Court to conclude that an injunction maintaining the status quo after the ICC's decision not to investigate does not intrude upon the agency's primary jurisdiction. Despite the agency's duty to appraise the probable and general reasonableness of a tariff when confronted with a protest from a shipper, a decision not to investigate and suspend says very little, if anything, about the lawfulness of a proposed tariff, as the Supreme Court recognized in *Southern Railway.* A refusal to investigate is not even an agency "decision," *see id.* at 454, 99 S.Ct. at 2394, and thus the ICC's primary jurisdiction to decide the reasonableness of a service is not diminished by a district court injunction maintaining the status quo until a decision is made. This is not to say that a district court should not give some weight to the agency's refusal to investigate, however; a court should take the agency's action into account by being very hesitant to find that a plaintiff is substantially likely to prevail on the merits before the ICC. In the instant

---

8. This conclusion is based on the assumption that Murray will initiate a complaint proceeding under section 11701. The order accompa-

nying this memorandum specifically requires Murray to begin this proceeding within twenty (20) days, or else the injunction will expire.

case, the Court would not have granted relief had the L&N produced any significant proof that the tariff was reasonable. The affidavits contained in the railroad's reply to the section 10707 proceedings are the rankest form of hearsay, and can be accorded little weight vis-a-vis the in-court testimony presented by Murray.

Although the import of the case has not been argued, at this point the Court finds it necessary to address the Supreme Court's decision in *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). In that case, a district court was asked to enjoin the operation of certain railroad tariff schedules even though, under former section 15(7) of the Act, the predecessor to section 15(8) and now section 10707, the rates should have automatically gone into effect after the agency's failure to decide the case within seven months from its initial suspension of the tariffs. The district court found that under the statute, the Commission had exclusive power to suspend the rate change, 372 U.S. at 661–62, 83 S.Ct. at 985–986, and the Supreme Court ultimately affirmed, placing special emphasis on the statutory language that the rate "shall" go into effect if the ICC fails to act within the prescribed time limit. *Arrow Transportation* is apparently still good law, as the Supreme Court cites it frequently in the *Southern Railway* decision. *Arrow* does not bar injunctive relief in the instant case, however, because the mandatory statutory language that went into effect if the Commission failed to reach a decision after suspending the tariff does not apply if the Commission expressly refuses to investigate and suspend. *See* section 10707(b). Moreover, *Arrow Transportation* did not cut off injunctive relief to aggrieved shippers;[9] under the former 28 U.S.C. § 2325, which was repealed in 1975,[10] an aggrieved shipper could apply to the appropriate three-judge district court having appellate jurisdiction for injunctive relief. *See* 372 U.S. at 671–72, 83 S.Ct. at 991. (At that time, three-judge district courts had appellate jurisdiction over the ICC, with a right of direct appeal to the Supreme Court).

In *City of Williamsport v. United States*, 273 F.Supp. 899 (M.D.Penn.1967), a three-judge district court acting as an appellate court held that a single district judge acted properly by enjoining the maintenance of the status quo until there had been final agency action in a protest proceeding against the termination of two passenger train services. *Id.* at 903. That decision was, however, based at least in part on the court's conclusion that the district court's action was necessary in order to provide effective judicial review by the three-judge panel, a consideration which is not present here. Although the court did not specifically rely on *Arrow Transportation* in reaching that result, the Supreme Court had noted in *Arrow* that its decision did not "reflect in any way upon decisions which have recognized a limited judicial power to preserve the court's jurisdiction *or maintain the status quo by [an] injunction* pending review of an agency's action through the prescribed statutory channels." 372 U.S. at 671 n. 22, 83 S.Ct. at 991. This power which is incidental to the court's ultimate jurisdiction to review final agency action, has never been recognized in derogation of "a clear congressional purpose to oust judicial power," which the Supreme Court found in the *Arrow Transportation* circumstances. That clear purpose is not present in this case, however, and this Court cannot conclude that Congress intended to deny injunctive relief under Rule 65, F.R.Civ.P., to a plaintiff like Murray that has so clearly satisfied the requirements for injunctive relief. If Congress intended to strip the district courts of their equity powers in cases where they have subject matter jurisdiction, if not primary jurisdiction to address the merits of a case, that intent must appear more clearly. It is clear to this Court that the ICC's decision not to investigate under section 10707 may, as in this case, subject a party to irreparable injury even though

---

**9.** The plaintiffs in *Arrow* were competitors of the defendant railroad, not shippers who relied on the railroad, as in this case.

**10.** Repealed by Act of January 2, 1975, P.L. 93–584, § 7, 88 Stat. 1918.

there has been no decision that the source of the injury is lawful under the Act. An injured party should have an opportunity to show that an injunction should issue, and if the ICC cannot provide that opportunity prior to the challenged action, a district court should be able to exercise its equity powers. Needless to say, Congress may alter the district courts' equity powers as it sees fit, but that intent does not appear in this case.

Therefore, the Court enjoins L&N from ceasing TOFC/COFC service to Murray Ohio in Lawrenceburg, Tennessee, until there has been some final agency action that can be reviewed by the Sixth Circuit. Plaintiff must initiate a complaint proceeding under 49 U.S.C. § 11701 within twenty (20) days, or else this injunction will expire.[11] The L&N was offered the opportunity to request a bond, but waived that right, and consequently no bond will be required.

---

**11.** Murray had requested the Court to take jurisdiction of this case under 28 U.S.C. § 1336, which provides that a district court shall have jurisdiction of any civil action to enforce any order of the ICC, and to enjoin or suspend any order of the ICC for the payment of money or the collection of fines, penalties, and forfeitures. Under the *Southern Railway* case it is clear to this Court that there has been no ICC order that could provide a basis for this Court's jurisdiction under 28 U.S.C. § 1336(a), and thus the referral mechanism of section 1336(b) is inapplicable.