UNION ELECTRIC COMPANY, Missouri Public Service Company; American Electric Power Service Corporation and Wisconsin Electric Power Company, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Abilene & Southern Railway Company et al., Intervenors-Respondents.

NATIONAL ASSOCIATION OF RECYCLING INDUSTRIES, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Abilene & Southern Railway Company et al., Intervenors.

SYSTEMS FUEL, INC., Arkansas Power & Light Company and Potomac Electric Power Company, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

CELANESE CHEMICAL COMPANY, INC., Arizona Electric Power Cooperative, Inc., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

NORTH DAKOTA STATE WHEAT COMMISSION and North Dakota Public Service Commission, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Abilene & Southern Railway Company et al., Intervenors-Respondents.

NATIONAL INSULATION TRANSPORTATION COMMITTEE, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Abilene & Southern Railway Company et al., Intervenors-Respondents.

CONSUMERS POWER COMPANY, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondent,

Abilene & Southern Railway Company et al., Intervenors-Respondents.

Nos. 79-1844, 79-1898, 79-1920, 79-1921, 79-1972, 80-1015 and 80-1089.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1980.

Decided July 16, 1980.

Charles J. McCarthy, Belnap, McCarthy, Spencer, Sweeney & Harkaway, Edward Merrigan and Charles W. Chapman, Washington, D.C., for petitioners.

H. Glenn Scammel, Atty., I. C. C., Washington, D.C., for respondent, I. C. C.

Richard Flynn, Sidley & Austin, Washington, D.C., for respondents.

Before LAY, Chief Judge, HENLEY, Circuit Judge, and HANSON,* Senior District Judge.

LAY, Chief Judge.

Petitioners in these consolidated cases represent shippers of various commodities whose transportation rates were affected by a general increase in railroad carrier freight charges, effective October 15, 1979.[1] They seek review of the Interstate Commerce Commission's, (ICC), decision not to suspend or investigate the increase before it became effective. Ex Parte 368, Increased Freight Rates and Charges, Nationwide— 1979. Before proceeding to the merits, we have limited briefs and argument to the question raised by appellee ICC's motion to dismiss: whether this court has jurisdiction to review the ICC decision and order. We conclude it does not.

I. . *Factual Background.*

On July 26, 1979, all railroads and certain water and motor carriers having joint rates with them petitioned the ICC for authority to file tariff schedules increasing freight rates. The carriers submitted 60 verified statements constituting their evidential case, gave notice and served the petition and statements, and furnished data to the public. *See* Procedures Governing Rail Carrier General Increase Proceedings, 49 C.F.R. §§ 1102.1–.9 (1979). They also filed an evaluation of environmental considerations, pursuant to ICC Revised Guidelines for Implementation of the National Environmental Policy Act of 1969, 49 C.F.R. §§ 1108.1–.20 (1979).

On August 8, 1979, the ICC granted special permission to publish and file the general increase schedules, or master tariff, as requested. It conditioned permission on the tariff taking effect upon not less than 30 days notice and expiring one year thereafter. The permission was given subject to protest and possible suspension and rejection. All prior ICC orders were ordered modified to the extent necessary to allow the filing.

The August 8th order made all common carriers by rail parties to the proceeding. Noting that the Interstate Commerce Act, 49 U.S.C.A. § 10707(c) (Supp.1979), requires filing verified complaints seeking suspension of proposed rate changes, the ICC required any person opposing the increase to file verified statements containing all relevant evidence the party wished the ICC to consider by September 6, 1979. Comments on environmental impact and presidential wage and price guidelines were specifically invited. The carriers were given until September 12th to file and serve replies and rebuttal evidence.

On October 5, 1979, the ICC issued a second decision and order. It concluded that, with one exception, "the record in this proceeding warrants that the Commission decline to suspend or investigate the proposed increase." The order was conditioned upon postponement of the effective date to October 15, 1979.

The ICC based its decision not to suspend the master tariff as a whole upon its finding that the proposed revenue increase was justified by increased railroad costs.[2] It also found requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 (NEPA), and the presidential wage and price guidelines were met.

---

* William C. Hanson, Senior District Judge, Northern and Southern Districts of Iowa, sitting by designation.

1. A general increase is "[a]n increase in freight rates or charges, by the carriers indicated, ['substantially all common carriers by railroad in the United States or in any of the three primary ratemaking territories'], applying to a substantial number of commodities or services, for which the justification is revenue need

. . . ." ICC Procedures Governing Rail Carrier General Increase Proceedings, 49 C.F.R. § 1102.1. The procedures for carrier initiation of a general rate increase are set forth in 49 C.F.R. §§ 1102.1–.9 (1979).

2. It found the carriers had not justified all their cost increases, however, and used $1.79 billion as the cost figure rather than the carriers' figure of $1.94 billion.

The decision mentioned three specific commodity groups. The increase for iron or steel scrap was the exception to the general order: it was ordered suspended and placed under investigation for a consolidated decision with another proceeding. The ICC allowed the general rate increases for recyclables on the condition that criteria of reasonableness and discrimination, established in an earlier, special investigation of recyclable rates, be met. The ICC also refused to exclude special grain tables from the master tariff.

## II. *Analysis.*

### A. *Increases on Coal and Wheat: Nos. 79–1972, 79–1844, 80–1089, 79–1920, 79–1921.*

**3.** Section 10707 is found in the recodified and revised subtitle IV of title 49, United States Code, "Transportation," 49 U.S.C.A. § 10101 et seq. (Supp.1979). It provides as follows:

*Investigation and suspension of new rail carrier rates, classifications, rules, and practices.*

(a) When a new individual or joint rate or individual or joint classification, rule, or practice related to a rate is filed with the Interstate Commerce Commission by a rail carrier providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title, the Commission may begin a proceeding, on its own initiative or on complaint of an interested party, to determine whether the proposed rate, classification, rule, or practice violates this subtitle. The Commission must give reasonable notice to interested parties before beginning a proceeding under this subsection but may act without allowing an interested party to file an answer or other formal pleading in response to its decision to begin the proceeding.

(b)(1) The Commission must complete a proceeding under this section and make its final decision by the end of the 7th month after the rate, classification, rule, or practice was to become effective. However, if the Commission reports to Congress by the end of the 7th month that it cannot make a final decision by that time and explains the reason for the delay, it may take an additional 3 months to complete the proceeding and make its final decision. If the Commission does not reach a final decision within the applicable time period, the rate, classification, rule, or practice—

(A) is effective at the end of that time period; or

(B) if already in effect at the end of that time period, remains in effect.

North Dakota Wheat Commission, (domestic and export grain), Union Electric Company, Consumers Power Company, Systems Fuel Inc., and Celanese Chemical Company, (coal), confine their challenge to the percentage by which the increase on their particular commodity exceeds the average nationwide or region-wide general increases. These petitioners request remand to the ICC with instructions to reconsider and make proper, adequate findings on the reasonableness of the increase as applied to their commodities. We first consider reviewability of the order in the context of their allegations.

The determinative issue is whether the ICC's action was a refusal under 49 U.S.C. § 10707(a) [3] to investigate lawfulness

(2) If an interested party has filed a complaint under subsection (a) of this section, the Commission may set aside a rate, classification, rule, or practice that has become effective under this section if the Commission finds it to be in violation of this chapter.

(c)(1) Pending final Commission action in a proceeding under subsection (a) of this section, the Commission may suspend the proposed rate, classification, rule, or practice for 7 months after the time it would otherwise go into effect or, if a report is made under subsection (b) of this section, for 10 months after the time it would otherwise go into effect. However, the Commission may suspend a rate under this subsection only if it appears from specific facts shown by the verified complaint of a person that—

(A) without suspension, the proposed rate change will cause substantial injury to the complainant or the party represented by the complainant; and

(B) it is likely that the complainant will prevail on the merits.

(2) The burden is on the complainant to prove the facts required under paragraph (1)(A) and (B) of this subsection.

(d) If the Commission does not suspend a proposed rate increase that is the subject of a proceeding under this section, the Commission shall require the rail carriers involved to account for all amounts received under the increase until the Commission completes the proceeding or until 7 months after the increase becomes effective, whichever occurs first, or, if the proceeding is extended under subsection (b) of this section, until the Commission completes the proceeding or until 10 months after the increase becomes effective, whichever occurs first. The accounting must specify by whom and for whom the amounts are paid. When the Commission takes final action, it shall require the carrier to refund to

or in the language of the revised Act, to begin a proceeding to determine whether the proposed rate violated the Interstate Commerce Act. If it was, the recent decision by the United States Supreme Court in *Southern Railway v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), teaches that it is unreviewable.

In *Seaboard*, a group of railroads filed a seasonal demand rate increase. *See* 49 U.S.C. § 10727. Shippers petitioned the ICC for suspension and investigation of the increases' lawfulness under what is now section 10707(a) of the Act.[4] A month after the rate filing, the ICC declined to suspend or investigate, and the shippers attempted to appeal that decision. The Court held the decision was not a final determination that the tariff was lawful, but rather a nonfinal decision not to investigate lawfulness. *Seaboard*, 442 U.S. at 452–54, 99 S.Ct. at 2393–94. The Court also held Congress did not intend review of a section 10707 "no investigation" decision, because the statutory language, design and history show the decision is committed to agency discretion. Additionally, the Court reasoned that review of an ICC decision not to suspend or investigate would require an initial, independent appraisal of the reasonableness of the proposed rate. This would conflict with legislative intent to avoid judicial disruption of the administrative rate-making process prior to final decision. Investigation is linked

to ICC power to suspend, the Court stated, and prior Supreme Court cases have held suspension decisions are unreviewable. The Court found support for its decision in the disruptive consequences of requiring judicially reviewable decisions on the legality of proposed tariffs in light of the numerous tariff filings, many of which include thousands of individual rates. Judicial review of refusals to investigate before rates become effective would lessen shipper incentive to initiate investigation and to obtain a final ruling on the reasonableness of their particular commodity's rate after it had become effective. *See* 49 U.S.C. §§ 11701(b), 10704(a)(1).[5]

■ Petitioners' request for review is premised on the assumption that the ICC made a final decision on a complete record after investigation, so *Seaboard* does not control. They claim the August 8th grant of authority to file a master tariff initiated a proceeding/investigation, an evidentiary record was assembled, and the October 5th decision was final. The decision approved the general increase and was not merely a refusal to suspend and to investigate. Some petitioners admit the ICC did not make a final determination on the lawfulness of the increase. However, they argue the ICC did finally decide on distribution of the increase among various commodity groups. Others argue the ICC finally decided the lawfulness of the general in-

the person for whom the amounts were paid that part of the increased rate found to be unjustified, plus interest at a rate equal to the average yield (on the date the proposed increase is filed) of marketable securities of the United States Government having a duration of 90 days. When any part of a proposed rate decrease is suspended and later found to comply with this subtitle, the rail carrier may refund any part of the portion of the decrease found to comply with this subtitle if the carrier makes the refund available equally to the shippers who participate in the rate according to the relative amounts of traffic shipped at that rate.

(e) In a proceeding under this section, the burden is on the carrier proposing the changed rate, classification, rule, or practice to prove that the change is reasonable. The Commission shall specifically consider proof that the proposed rate, classification, rule, or practice will have a significantly adverse ef-

fect (in violation of section 10701, 10741–10744, or 11103 of this title) on the competitive posture of shippers or consignees affected by the proposed rate, classification, rule, or practice. The Commission shall give proceedings under this section preference over all other proceedings related to rail carriers pending before it and make its decision at the earliest practical time.

4. Section 10707 of the recodified Act corresponds to former section 15(8)(a), under which the ICC acted in *Southern Railway v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). The recodification did not make substantive changes. *See* Legislative Purpose and Construction, Pub.L. No. 95–473, § 3, 92 Stat. 1466 (1978), preceding 49 U.S.C.A. § 10101 (Supp.1979).

5. Formerly 49 U.S.C. §§ 13(1) & 15(1).

crease, *i. e.,* whether general need for increased revenue was shown by the record.

To determine if the ICC order was a refusal to investigate, the Court in *Seaboard* examined the order's express language in light of the inquiry the ICC makes upon a shipper's request to suspend and investigate a rate increase. We accordingly consider the express language of the October 5th order, mindful that it follows a grant of special permission to file general increase schedules subject to protest and possible suspension.

The order expressly states the record warrants that the Commission "decline to suspend or investigate the proposed increase." The order contains one exception: the increase proposed for iron or steel scrap on certain routes was suspended and placed under investigation. Not only does the express language indicate the decision was a refusal to investigate, but the exception makes little sense if, as petitioners assert, the order was in reality a post-investigation one.

On the other hand, petitioners point out the railroads' petition requested the ICC to institute a proceeding, and the ICC did so, making all railroads parties. Also, the August 8th order invited opponents to submit verified statements for the ICC to consider "with respect to statutory suspension of the rates pending completion of the investigation, as well as evidence relevant to the ultimate decision." (Emphasis added). The underlined portion implies an investigation was begun, whereas in *Seaboard* there clearly was no investigation. Petitioners also point out section 10707(d) requires carrier refunds when the ICC decides not to suspend a proposed increase "that is the subject of a proceeding under this section," and the August 8th order required that the tariff provide for refunds in the event of

ICC disapproval or modification of the increases. It is uncontested that extensive data were submitted,[6] the ICC found cost justification for increased revenue, and the proposed increases went into effect just as they would have if the ICC had affirmatively approved them after an investigation. In fact, the order at one point states that it "authorizes the proposed increases."

Thus upon an initial reading, it appears a final decision was made following an investigation. This superficial interpretation of the order is erroneous, however, because it equates any investigation with an investigation to determine lawfulness under section 10707(a). However, ICC procedures for carrier initiation of a general rate increase are not necessarily equivalent to commencement of an investigation within the meaning of section 10707.

Evaluation of data that ICC regulations require carriers to file in order to initiate a general rate increase and the subsequent finding of revenue need are not inconsistent with a refusal to investigate a proposed general increase. Special procedural rules differentiate initiation of a general rate increase from an increase on one commodity group or one route. *See* 49 C.F.R. §§ 1102–.9 (1979). Quite apart from a section 10707 investigation, but simply to obtain permission to file general increase rate schedules, carriers must file detailed cost and revenue data concurrently with the schedules. 49 C.F.R. § 1102.1. A condition for permission to file the schedules is that the date the new rates go into effect is at least 30 days from filing, "to enable proper evaluation of the evidence presented." *Id.* Routine evaluation of the data for each and every proposed general increase is distinct from institution of a formal proceeding. For instance, the regulations provide that if a formal proceeding is instituted, carriers may update their evidence. *Id.*[7]

---

6. Concurrently with the rate schedules, carriers that initiate a general rate increase must file and serve "verified statements presenting and comprising the entire evidential case which is relied upon to support the proposed increases." 49 C.F.R. § 1102.1. Required minimum data pertain to: general and accessorial services revenue related to the last prior general increase, § 1102.2; financial and revenue need, § 1102.3; cost and revenue relationships of specific commodities, § 1102.4; recent, present and projected employment, wages, fringe benefits and productivity, § 1102.5(a); impact of holddowns and exceptions from the proposed general increase for specific commodity groups, § 1102.5(b); transactions with parent, subsidiary or affiliated companies, § 1102.6.

7. This, ironically, is a challenge on review: the ICC violated its regulations by considering updated cost evidence that carriers submitted in

**1354**

■ It is evident from section 10707 that routine evaluation of evidence filed pursuant to regulations governing initiation of a general increase is distinct from an investigation within the meaning of section 10707. Although the *Seaboard* opinion and the language of the ICC order here refer to an "investigation," neither section 10707 nor its predecessor, § 15(8), use the term. Section 10707(a) provides the ICC "may begin a proceeding . . . to determine whether the proposed rate . . . violates this subtitle." Section 10707(c)(1) provides that "[p]ending final Commission action in a proceeding under subsection (a) of this section, the Commission may suspend the proposed rate . . . ." Therefore, to investigate under section 10707(a) is to conduct a proceeding to determine whether the proposed rate violates the Act, *i. e.*, whether it is unreasonable. A refusal to suspend and investigate under section 10707 has a precise meaning: it is a refusal to initiate a proceeding to determine lawfulness of the rate. It does *not* mean refusal to initiate any type of proceeding, consider any evidence, or make any finding.

ICC consideration of evidence submitted to support a temporary, seasonal, area-wide increase in the *Seaboard* case did not indicate the ICC order was anything other than a refusal to investigate under section 10707(a). The Court stated in *Seaboard* that when the ICC decides whether to suspend and investigate before a rate becomes effective automatically, it "make[s] a prompt appraisal of the probable and general reasonableness and legality of the proposed schedule—which may, as in this case, involve thousands of rates for designated commodities and routes—rather than a de-

tailed review of the lawfulness of each individual component of the tariff schedules." *Seaboard*, 442 U.S. at 453, 99 S.Ct. at 2393. Thus, in a decision whether to investigate, probable and general findings are made upon a limited record. However, they are not equivalent to a final determination of lawfulness following a section 10707(a) proceeding. Similarly, a finding that market dominance does not exist does not convert a limited decision not to investigate under section 10707 into a final decision to approve rates after investigation. *See Georgia Power Co. v. United States*, 617 F.2d 107, at 109 (5th Cir. 1980). In this case, taking evidence, making a decision on cost justification for a general increase and allowing the increase to become effective, do not convert refusal to investigate into a final, post-investigation decision.

While the factual situation in *Seaboard* is distinguishable because it was not a nation-wide general increase proposal, the proposed increase was area-wide and the schedules included thousands of rates. The Court held no final determination on the legality of each was or could be made in the decision to suspend or investigate. Rather, the decision could only be an appraisal of general reasonableness and legality. 442 U.S. at 453, 99 S.Ct. at 2393. It is also merely an appraisal of probable reasonableness, *i. e.*, it is not a final determination. *Id.* Here, as in *Seaboard*, a decision on general and probable reasonableness was made. It cannot be interpreted as a final ruling on the legality of the general increases.[8]

To accept petitioners' basis for distinguishing *Seaboard* would be to hold that

their replies. The ICC reprimanded the carriers, but decided to go ahead and consider the data. Had a proceeding to finally determine lawfulness been instituted by the August 8th order, as petitioners contend, no reprimand would have been made, as the updated cost evidence would have been properly submitted.

8. The ICC took the position at oral argument that the finding of general need for increased carrier revenue is final and reviewable. *See also Aberdeen & Rockfish R. R. v. SCRAP (SCRAP II)*, 422 U.S. 289, 317 n.18, 95 S.Ct. 2336, 2354, 45 L.Ed.2d 191 (1975); *Council of Forest Indus. v. ICC*, 570 F.2d 1056, 1062 (D.C.

Cir.1978); *Asphalt Roofing Mfg. Ass'n v. ICC*, 567 F.2d 994, 1002 (D.C.Cir.1977). The question is unsettled. *See* p. 1356 & n.10 *infra*. It does not affect our analysis here, as petitioners do not challenge the finding of revenue need, but the "rate structure," *i. e.*, whether the increase on their commodity is a disproportionate allocation of the burden of meeting revenue need. The most clearly nonfinal aspect of the ICC decision is rate structure. It may be redesigned as a result of successful shipper complaints concerning the rate for a particular commodity, instituted under the procedures set forth in sections 11701(b) and 10704(a).

due to procedures for carrier initiation of general rate increases, the ICC can never decline to suspend or investigate a general increase. In their view, once it has permitted filing of the master tariff and evaluated the accompanying verified statements, the ICC has already investigated within the meaning of section 10707(a). However, a final decision on lawfulness can be made in a general increase proceeding after initiation of a section 10707(a) investigation; it is a different decision than a refusal to investigate based on evaluation of the proposed schedules and supporting data. The Court in *Aberdeen & Rockfish Railroad v. SCRAP (SCRAP II)*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), gave examples of final decisions that could be made in the context of a general rate increase proceeding:

> Of course, the ICC has the power in a general revenue proceeding to declare the new rates unlawful and disapprove the increase. It could also, if it chose, declare some of the rates discriminatory, unreasonable, or otherwise unlawful; and it could itself affirmatively approve all or some of the rates as just and reasonable.

*Id.* at 313–314, 95 S.Ct. at 2353. This type of lawfulness ruling was not made here. ■ Other language in the order illustrates the limited nature of the ICC inquiry here. The ICC order did not explicitly reserve determinations on the reasonableness of particular rates for sections 11701(b) and 10704(a) refund proceedings, *see SCRAP II,*

422 U.S. at 313, 95 S.Ct. at 2352. It did refuse to exempt grain tables, however, and stated that the issue would be better considered in a separate, post-effective proceeding initiated by shipper protest. *See* 49 U.S.C. § 10704(f). The order thus assumes that although the ICC did not initiate a proceeding to determine the legality of each particular commodity's treatment, an administrative remedy under the Act remains open to shippers.[9]

The language of the order, viewed in light of the nature of decisions to suspend and investigate general rate increases, convinces us that the ICC declined to initiate a proceeding under section 10707 to determine the legality of the general increase. Under the holding in *Seaboard*, that decision is committed to ICC discretion and therefore is not judicially reviewable.

### B. *Recyclable Materials.*

■ The National Association of Recycling Industries, Inc., (NARI), contends the decision is reviewable as it relates to recyclables, because the ICC did make a lawfulness determination on recyclable rates. NARI argues increases authorized for recyclables were unreasonable and discriminatory.

The ICC stated in its decision that it would "allow the general rate increases proposed for recyclables," on the condition that criteria set recently in a special, statutorily

---

**9.** We appreciate that in a post-effective, shipper-initiated challenge to reasonableness of a rate under sections 11701(b) and 10704(a), a shipper cannot raise the issue of lack of evidence in the general increase proceeding record to support the percentage by which a particular rate was increased. The burden is to show how the increased rate being charged has actually operated to a shipper's disadvantage. *See Koppers Co. v. Chesapeake & O. Ry.,* 303 I.C.C. 383 (1958). These are problems the Act causes shippers. They do not suffice to permit courts to revise the statute so as to allow review. Congress designed a carrier-initiated ratemaking process that requires the shipper to challenge reasonableness after the rate is in effect. The ICC, with Supreme Court approval, decided that when the nation's railroads collectively need revenue quickly, the rate initiation and rate challenge scheme is basically the same. The burdens on shippers of having to make many individual complaints after the general

increase goes into effect and prove actual unreasonableness and damage were deemed preferable to requiring a thorough and final ICC ruling on reasonableness *prior* to allowing rates to take effect. *See Seaboard,* 442 U.S. at 457–58, 99 S.Ct. at 2395–2396; *SCRAP II,* 422 U.S. at 312, 95 S.Ct. at 2352 (quoting *United States v. Louisiana,* 290 U.S. 70, 76–77, 54 S.Ct. 28, 31–32, 78 L.Ed. 181 (1933)).

In *Seaboard,* an area-wide increase was allowed to become effective, a result which was, in practical effect, final for shippers. The increase was temporary and seasonal and could well expire and another go into effect before shippers obtained final rulings in separate refund proceedings. Similarly, we recognize the one-year general increase that is now effective may expire and another become effective before shippers obtain relief. Delay in obtaining a final and reviewable decision is a feature of the Act, however, and is not ground for judicial revision.

mandated investigation of rates for recyclables, Ex Parte 319, were met. Under Ex Parte 319, a reasonable recyclable rate could not exceed the revenue-to-variable-cost ratio of 180%; a recyclable's variable-cost ratio had to be less than or equal to that for the corresponding virgin commodity for the rate to be nondiscriminatory.

This decision is clearly not merely a refusal to investigate under section 10707(a). It is not a decision on general reasonableness, because it pertains only to a specific commodity group's rate. It is not a ruling on probable reasonableness, because a precise maximum figure was set, a figure that was the final determination of reasonable recyclable rates, established after a recent and thorough investigation. While the ICC did not commence a proceeding to determine lawfulness of rates for recyclables in this general increase proceeding, it also did not merely refuse to investigate: relying entirely upon its former investigation and decision, it affirmatively approved rates within that reasonable maximum.

Thus, the reasoning underlying the *Seaboard* bar to reviewability does not apply. However, the policy and reasoning of precedent against review of the effect on a particular commodity of a general increase proceeding order does apply, and it precludes NARI's petition.

The law is uncertain on review of orders entered in general increase proceedings, even "final" orders entered after an actual investigation. Courts have even withheld review of the narrow decision that evidence of revenue need justified a general increase, on the ground that a shipper must exhaust administrative remedies under sections 11701(b) and 10704(a).[10] However, it is of greater significance for NARI's challenge that there is uniform precedent against review of a general increase's effect *on a*

particular commodity. See *Algoma Coal & Coke Co. v. United States*, 11 F.Supp. 487 (E.D.Va.1935); *Koppers Co. v. United States*, 132 F.Supp. 159 (W.D.Pa.1955); *Florida Citrus Commission v. United States*, 144 F.Supp. 517 (N.D.Fla.1956), aff'd mem., 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957); *Electronic Industries Association v. United States*, 310 F.Supp. 1286 (D.D.C. 1970), aff'd mem., 401 U.S. 967, 91 S.Ct. 1188, 28 L.Ed.2d 318 (1971). See also *Council of Forest Industries v. ICC*, 570 F.2d 1056, 1060–62 (D.C.Cir.1978); *National Association of Recycling Industries, Inc. v. ICC.*, 627 F.2d 1341, at 1344 (NARI III) (D.C.Cir. 1980). The reasoning is that normally the ICC does not finally rule on the reasonableness of a specific commodity's rate in a general revenue proceeding, and it is not an appropriate issue to resolve on the limited record of such a proceeding. Since the ICC does not decide it, it is not ripe for review. To obtain a final and reviewable ruling, an individual, post-effective complaint must be brought under sections 11701 (b) and 10704(a) seeking a refund and a declaration of reasonableness.

This precedent would seem to preclude NARI's petition, as NARI challenges the general increase order only insofar as it relates to recyclables. However, the reasoning loses its force when, as here, the ICC does not merely decide to refrain from declaring a general increase lawful or unlawful. As NARI points out, the ICC actually did pass on the specific issue of reasonable and nondiscriminatory rates for recyclables. It did not use a limited and general record compiled for evaluation of a general, across-the-board increase, but relied on a prior, specific investigation of recyclable rates. This weakens policy arguments against immediate review. See *Council of Forest In-*

---

10. See *Alabama Power Co. v. United States*, 316 F.Supp. 337 (D.D.C.1969) and *Atlantic City Elec. Co. v. United States*, 306 F.Supp. 338 (S.D.N.Y.1969), both aff'd mem. by an equally divided court, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970); see discussion in SCRAP II, 422 U.S. at 314–16, 95 S.Ct. at 2353–2354. Another court has held the narrow issue of whether evidence of revenue need was adequate to support a general increase is reviewa-

ble, because the ICC does actually pass upon it in a general increase proceeding. *Algoma Coal & Coke Co. v. United States*, 11 F.Supp. 487 (E.D.Va.1935). The Supreme Court refrained from deciding the issue in 1975. *SCRAP II*, 422 U.S. at 317 n.18, 95 S.Ct. at 2354. The ICC takes the position that the narrow issue of general revenue need is reviewable, but not the distribution of the increase among particular commodities. See n.8 supra.

dustries v. ICC, 570 F.2d at 1063; *NARI III*, at 1344.

However, we conclude that the circumstances of this case do not warrant making an exception to the rule of nonreviewability. It is simply not necessary, and perhaps undesirable, to review NARI's contentions in this general revenue proceeding. While the ICC decision on recyclable rates did in fact rest upon an investigation of lawfulness, it was not an investigation initiated in this general revenue proceeding, but the Ex Parte 319 investigation. The decision following that investigation, adhered to by the ICC here, was reviewable and has been reviewed by the District of Columbia Circuit. Furthermore, court-ordered remand of Ex Parte 319 illustrates that NARI's contentions are not best addressed on review of a general increase order.

As NARI points out, the 180% ratio that is the standard of reasonableness set in Ex Parte 319 and adhered to by the ICC in its order here, was vacated on review. *National Association of Recycling Industries, Inc. v. ICC,* 627 F.2d 1328, at 1340 (*NARI II*) No. 79–1393 and consolidated cases (D.C. Cir. April 25, 1980). The court held selection of the 180% figure was completely unsupported by explanatory discussion of fundamental considerations such as justification for the resulting higher-than-normal profit levels. *Id.* It remanded to the ICC for further proceedings to define what rates for recyclables are reasonable; and until that decision is issued, it ordered revoked any published increases approaching the 180% standard.

Simultaneously, the District of Columbia Circuit decided *NARI III,* a case with a factual situation nearly identical to the one before us. In it, NARI petitioned for review of general revenue proceedings conducted after Ex Parte 319 was decided, and in which specific rulings on the reasonableness of rates for recyclables were made. The court discussed, but did not decide, whether the general increase order, insofar as it pertained to recyclables, could be reviewed. At 1333. It held NARI could get full relief through the Ex Parte 319 proceedings on remand, because the Ex Parte 319 record had been updated with revenue data from the general increases that NARI sought to challenge. At 1332–1333. Therefore, it held NARI's challenge to the general revenue proceeding order was moot.

Whether or not the revenue data in Ex Parte 319 has been or can be updated to reflect the general increase at issue here, the remand of Ex Parte 319 illustrates that NARI's contentions are not best resolved by review of this general increase order. The ICC did not investigate rates on recyclables in this proceeding, but relied upon Ex Parte 319 and briefly restated the conclusion it had reached there. Both review of the order, and the continuing jurisdiction NARI urges we maintain if we remand, would take our review beyond the record here to the record in Ex Parte 319. That task has already been undertaken and completed by the District of Columbia Circuit. The fact that the ICC may change its decision on remand of Ex Parte 319 in light of *NARI II* and new knowledge, is further evidence of the limited decision made here and the absence of a need to reopen the proceedings. *See SCRAP II,* 422 U.S. at 327, 95 S.Ct. at 2359. Proceeding either within Ex Parte 319 on remand, if possible, or by a section 11701(b) complaint, NARI will have the benefit of a more complete record than that compiled in this proceeding. It also can obtain a final ruling, the reviewability of which would not be subject to question.

## C. *Environmental Considerations.*

Both NARI and the National Insulation Transportation Committee (NITCOM), challenge ICC compliance with NEPA and the ICC's implementing regulations, 49 C.F.R. §§ 1108.1–.20 (1979). The ICC ordered stated: "This decision will not significantly affect either the quality of the human environment or conservation of energy resources."

In *SCRAP II,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Court held that regardless of whether a general increase proceeding order was reviewable, ICC compliance with NEPA in the proceeding was reviewable. The Court reasoned that the ICC had made a final decision on environmental impact, and no relief for inadequate environmental consideration *in that pro-*

*ceeding* could be obtained by subsequent shipper complaints. *Id.* at 317–18, 95 S.Ct. at 2354, 2355. Because of the limited and nonfinal nature of a decision not to declare a general increase unlawful, and the more extensive ICC attention to environmental consequences of the commodity's rate structure in another proceeding, the Court held the environmental impact statement was sufficient even though it was quite limited. *Id.* at 322–28, 95 S.Ct. at 2356–2359.

■ NARI's challenge to treatment of environmental issues in this general increase proceeding ignores its own major contention on appeal: that the decision on recyclable rates here rested "entirely" on the decision in Ex Parte 319. The District of Columbia Circuit recently held that the ICC in Ex Parte 319 had "sufficiently considered the impact of the recyclables rate structure upon environmental factors." *NARI III*, at 1345. Environmental consideration sufficient for that particularized investigation is, *a priori*, sufficient for the more limited and general action taken here in reliance on Ex Parte 319.

Unlike recyclables, insulating materials were not singled out for an arguably final decision on lawfulness, and thus the ICC decision as it affects them is merely a refusal to investigate. *SCRAP II*'s logic would indicate consideration of environmental issues in even such a limited decision is reviewable. The ICC has finally decided not to consider further the environmental consequences of its refusal to investigate; subsequent proceedings under sections 11701(b) and 10704(a) could not produce relief from inadequate consideration in that earlier proceeding.

■ However, the *SCRAP II* post-investigation decision not to declare a general increase unlawful required only a limited

environmental assessment. Logically, an even more limited assessment should suffice for a refusal to investigate. The ICC made no attempt in this general proceeding to separately examine the rate structure of insulating materials. It therefore cannot be required to thoroughly examine, independently of the impact of the increases as a general matter, the separate environmental consequence of a particular commodity's increase. NITCOM does not relate its environmental allegation, increased air pollution from the increased rates for insulating materials, to the environmental consequences of the general and limited decision not to investigate the general increases. The issue could be specifically addressed in a proceeding under sections 11701(b) and 10704(a). We may not entertain the challenge at this juncture.[11]

The petitions for review are ordered dismissed for lack of subject matter jurisdiction.

---

**11.** NITCOM's claim that the ICC was required to prepare a statement of energy impact lacks merit. A statement is not required when the ICC decides not to investigate. ICC Implementation of the Energy Policy and Conservation Act of 1975, 49 C.F.R. § 1106.6(b). NITCOM also claims that the ICC did not follow its own regulations because it failed to require specific cost and revenue data on insulating material. *See* 49 C.F.R. § 1102.4 (Schedule C). Other petitioners contended the ICC failed to follow its regulations because it allowed carriers to submit updated cost data in their replies. No constitutional claim of deprivation of procedural due process is raised. The claims of evidentiary error are ultimately directed to the issue of the reasonableness of a particular commodity's proportionate share in meeting increased revenue need. Because we hold the ICC order was a discretionary and unreviewable refusal to investigate and these claims relate to a particular commodity rate, we decline review.