ARIZONA ELECTRIC POWER COOP-
ERATIVE, INC., et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Eastern and Western Railroads, Southern
Railroads, Intervenors.

The ALUMINUM ASSOCIATION,
INC., Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Eastern, Southern and Western
Railroads, Intervenors.

KAISER ALUMINUM & CHEMICAL
CORPORATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Eastern, Southern and Western
Railroads, Intervenors.

Nos. 80–1761, 80–2016 and 80–2057.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1981.

Decided March 16, 1982.

William L. Stover with whom C. Michael Loftus and Donald G. Avery, Washington, D. C., were on the brief for Arizona Elec. Power Co-op., Inc., et al., petitioners in No. 79–1761.

Dickson R. Loos with whom David H. Baker, Washington, D. C., was on the brief for The Aluminum Ass'n, Inc., petitioner in No. 80–2016.

Denise M. O'Brien with whom John H. Caldwell and John H. Spellman, Washington, D. C., were on the brief for Kaiser Aluminum and Chemical Corp., petitioner in No. 80–2057.

Ellen K. Schall, Deputy Associate Gen. Counsel, with whom Richard A. Allen, Gen. Counsel, and Robert S. Burk, Deputy Gen. Counsel, I.C.C., Washington, D. C., were on the brief for respondent, I.C.C.

Joseph H. Dettmar, Atty., I.C.C., John J. Powers, III, and Kenneth P. Kolson and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.

Richard J. Flynn with whom Richard E. Young and R. Eden Martin, Washington, D. C., were on the brief for intervenors.

Before BAZELON, Senior Circuit Judge, and MacKINNON and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge.

On July 3, 1980, the Interstate Commerce Commission ("Commission") declined to suspend or investigate certain general rate increases proposed by the nation's railroads ("railroads"). (*Ex parte* No. 375 (Sub-No. 1). JA 1130–1142). This action has been attacked by petitioning commodity shippers on a variety of grounds. Inasmuch as Commission actions of this sort are by past case-law outside the jurisdiction of this Court, we find the Commission order unreviewable and refrain from addressing the various substantive contentions at issue.

I

On February 3, 1980, the railroads presented a two phase rate increase request to the Commission.[1] Claiming that inflationary costs were seriously damaging the industry, the railroads petitioned for a rate increase to meet the incremental rising costs (phase I) and then for a subsequent increase to enhance profits (phase II). The requests, styled "general" or "across-the-board" increase requests,[2] conformed to the applicable regulations governing rail carrier general increase proceedings.[3]

The Commission approved phase I on March 19, 1980. (Pet. Aluminum Ass'n

---

1. Under the Interstate Commerce Act, 49 U.S.C. § 10702, common carriers by railroad have the initiative in rate making, and may change their rates by filing a new tariff or a supplement to their existing tariff on at least thirty days notice. Before the rate change goes into effect, the Commission has an opportunity, pursuant to 49 U.S.C. § 10707, to suspend change pending an investigation into its lawfulness. The Commission, alternatively, may investigate but decline to suspend the new rate (allowing the rate to go into effect subject to refund) or may decline to suspend or investigate. If the agency does not suspend or investigate, any person may compel the agency to adjudicate the lawfulness of particular changes by filing a complaint under 49 U.S.C. §§ 10704 and 11701. The Staggers Rail Act of 1980, Pub.L.No.96–448, 94 Stat. 1895 (codified in scattered sections of 11, 45 & 49 U.S.C.), significantly reduces the Commission's authority to regulate railroad rates.

2. The "general" rate increase is a common mechanism for changing nationwide railroad carrier rates. By this procedure, virtually all the nation's railroads simultaneously seek Commission approval to raise the rates charged for carriage of a wide variety of commodities. In the Commission proceeding that follows, the primary concern is whether the carriers filing for the increase demonstrate a need for the additional revenues that will be generated by the increase. *See Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 311–14, 95 S.Ct. 2336, 2351–2353, 45 L.Ed.2d 191 (1975), wherein the Supreme Court said,

> The instant proceeding, in which substantially all of this country's railroads sought increases in substantially all of their rates based upon alleged cost increases which placed them in a financial crisis, plainly qualifies as a general revenue proceeding.

*Id.* at 314, 95 S.Ct. at 2353. General rate proceedings do not specifically inquire into the justification for the proposed increase in the carriage rate of any particular railroad line for any particular commodity. *See Council of Forest Industries of British Columbia v. ICC*, 570 F.2d 1056, 1061 (D.C.Cir. 1978).

3. The Commission has developed special procedures governing railroad general rate increases. These rules, set out at 49 C.F.R. 1102, were promulgated by the Commission in *Ex parte* 290, Procedures—Rail Carrier General Increase Proceedings, 351 I.C.C. 544 (1976). The regulations require that the railroads file proposed general increases on at least forty five days notice and that they submit extensive information when they file the tariff. That information must detail the need of the railroads for additional revenue and must reveal the current profitability—the ratio of revenue to variable costs—of the some one hundred major commodities moving by rail.

Brief at App. B). On May 12, 1980, the railroads restructured their phase II petition because subsequent to the March 19 order there had been a total cost escalation of $1,571.4 million nation-wide and expected revenues during that same period would, due to hold-downs, flagouts and delays in interstate applications, be only $1,504 million nationwide. (JA 46–136). Whereas initially the second increase was designed to enhance profits, that increase now was to help defray the additional rising costs.

On May 20, 1980, the Commission gave the railroads permission to file the proposed second increase, made all railroads respondents, and invited any persons opposing the proposed increases or wishing to comment thereon to file protests within fifty days against the increase action. (JA 432–445). Some two hundred parties responded, seeking suspension of the increase and investigation into its justification. The railroads filed replies to these protests on June 19.

On July 3, 1980, the Commission, finding that the railroads had demonstrated general revenue need, issued a decision pursuant to 49 U.S.C. § 10707[4] declining to suspend or investigate the increase except as it applied to scrap iron and steel and certain other recyclable commodities. (JA 1131). However, the Commission conditioned its decision on the carriers' filing a supplement to the increase limiting the increase on certain commodities[5] to percentages no greater than the average cost increases in each region and between the regions.[6]

Petitioners have attacked this July 3 order on a number of grounds, most notably alleging that the Commission order did not comply with the requirements of a general increase proceeding and that that order was in any event arbitrary and capricious.

## II

We decline to review *Ex parte* No. 375 (Sub-No. 1) for three reasons. First, the Supreme Court has held that Commission decisions declining to suspend or investigate proposed railroad rate increases are unreviewable. Second, as a number of lower courts have held, Commission findings of general revenue need are likewise unreviewable. Finally, review of shipper challenges to particular rates are either barred or not yet ripe for decision. Petitioners who did not file timely complaints are now precluded from challenging the lawfulness of the rate increase. Those who filed complaints under Sections 10704 and 11701 of the Interstate Commerce Act now await final decision from the Commission on the merits of their respective claims.

### A. The Commission Decision not to Suspend or Investigate

In *Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct.

---

4. 49 U.S.C. § 10707(c)(1) provides:

The Commission may not suspend a proposed rate, classification, rule, or practice during the course of a Commission proceeding under this section unless it appears from the specific facts shown by the verified statement of a person that—

(A) it is substantially likely that the protestant will prevail on the merits;

(B) without suspension, the proposed rate change will cause substantial injury to the protestant or the party represented by the protestant; and

(C) because of the peculiar economic circumstances of the protestant, the provisions of subsection

(D) of this section do not protect the protestant.

(2) The burden shall be on the protestant to prove the matters described in paragraph 1(A), (B), and (C) of this subsection.

5. The commodities subject to the holddowns were wheat, barley, clays, potash fertilizer, phosphate rock, wheat flour, milling products, sugar (refined, cane, or beet), commercial fats and oils, sodium alkalies, soda ash, industrial gases, rubber, petroleum coke, iron and steel pipe and primary aluminum products. (JA 1146–1148).

6. The average increase or cost recovery percentages were (JA 1149):

| District | Percent |
|---|---|
| Within East | 5.47 |
| Within South | 3.71 |
| Within West | 6.48 |
| Between East and South | 4.47 |
| Between East and West | 6.12 |
| Between West and South | 5.26 |

2388, 60 L.Ed.2d 1017 (1979), a Commission decision not to suspend or investigate a proposed nationwide increase in the railroad carriage rates for grain and soybeans was challenged by a number of shippers who alleged impropriety in the fixing of the rate in question. The Supreme Court ruled out judicial scrutiny of the Commission order, on the ground that the relevant section of the Interstate Commerce Act could not possibly "be read to tolerate judicial review of the Commission's decision *not* to investigate the lawfulness of a proposed rate schedule." *Id.* at 454, 99 S.Ct. at 2394. With respect to the consequences of a rule that would require Court review of such Commission decisions, the Supreme Court remarked:

> The disruptive practical consequences of such a determination confirm our view that Congress intended no such result. The Commission reviews over 50,000 rate-schedule filings each year; many, including the one involved here, contain thousands of individual rates.... If the Commission, which generally makes its ... investigation decisions within 30 days in order to allow *pre*-effective suspension, must carefully analyze and explain its actions with regard to each component of each proposed schedule, and if it must increase the number of investigations it conducts, all in order to avoid judicial review and reversal, its workload would increase tremendously.

*Id.* at 457, 99 S.Ct. at 2395. See also *Aberdeen & Rockfish R.R. Co. v. SCRAP*, 422 U.S. 289, 311, 95 S.Ct. 2336, 2351, 45 L.Ed.2d 191 (1975); *Consolidated Rail Corp. v. National Association of Recycling Industries, Inc.*, 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981); *United States v. SCRAP*, 412 U.S. 669, 691–92, 698, 93 S.Ct. 2405, 2417–2418, 2421, 37 L.Ed.2d 254 (1972); *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1962).[7]

The instant case fits squarely within the *Seaboard* ruling. In *Ex parte No. 375 (Sub-No. 1)*, the Commission specifically stated that it was "declin[ing] to suspend the proposed increase." (JA 1131). It also conforms to a recent decision by the Eighth Circuit in *Union Electric Co. v. United States*, 626 F.2d 1348, 1355 (8th Cir. 1980), involving a challenge virtually identical to that challenge here at issue,

> The language of the order, viewed in light of the nature of decisions to suspend and investigate general rate increases, convinces us that the ICC declined to initiate a proceeding under section 10707 to determine the legality of the general increase. Under the holding in *Seaboard*, that decision is committed to ICC discretion and therefore is not judicially reviewable.

We consequently find that this Court lacks jurisdiction to review the various complaints herein set forth.

### B. General Revenue Need

Petitioners maintain that the Commission's findings on general revenue need were erroneous, insofar as the evidence submitted by the railroads on that point was inaccurate and inflationary. We decline consideration of this allegation as well. Review of the Commission's revenue need determination would be inconsistent with the holdings of such cases as *United States v. SCRAP, supra,* and *Seaboard*, that the Com-

---

7. For other cases holding Commission decisions concerning investigation and suspension of rates unreviewable, *see Georgia Power Co. v. United States*, 617 F.2d 107 (5th Cir. 1980); *Lone Star Steel Co. v. United States*, 600 F.2d 492 (5th Cir. 1979); *Asphalt Roofing Manufacturers Ass'n v. ICC*, 567 F.2d 994 (D.C.Cir. 1977); *Port of New York Authority v. United States*, 451 F.2d 783 (2d Cir. 1971); *Cincinnati, N.O. & T.P. Ry. Co. v. Chesapeake & O. Ry. Co.*, 441 F.2d 483, 489 (4th Cir. 1971); *Commonwealth of Pa. v. Fed. Maritime Comm'n*, 392 F.Supp. 795, 796, 802 (D.D.C.1975); *North Carolina Natural Gas Corp. v. United States*, 200 F.Supp. 740, 751 (D.Del.1961); *Freeport Sulphur Co. v. United States*, 199 F.Supp. 913, 916 (S.D.N.Y.1961); *Luckenbach S.S. Co. v. United States*, 179 F.Supp. 605, 610 (D.Del. 1959), *modified*, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960); *Coastwise Line v. United States*, 157 F.Supp. 305, 306 (S.D.Cal.1957); *Nat'l Water Carriers Ass'n v. United States*, 126 F.Supp. 87, 90 (S.D.N.Y.1954); *Algoma Coal & Coke Co. v. United States*, 11 F.Supp. 487 (E.D.Va.1935).

mission's refusal to suspend or investigate a general rate increase as a whole is not reviewable. That refusal is based almost exclusively on a finding that the increases as a whole are warranted by the revenue needs of the railroads. *Aberdeen & Rockfish R.R., supra*, 422 U.S. at 311–13, 95 S.Ct. at 2351–2352. To hold that the *basis* for the Commission's decision not to suspend or investigate the general increase as a whole—the finding of revenue need—is reviewable amounts to a holding that the *decision itself* is reviewable. The latter result is plainly forbidden by *Seaboard* and *Arrow.* As the Commission's refusal to suspend or investigate the general increases is not reviewable, the grounds for that decision are perforce not reviewable as well.

Two three-judge courts have found Commission findings on general revenue need outside the jurisdiction of the federal courts. In *Alabama Power Co. v. United States*, 316 F.Supp. 337 (D.D.C.1969), *aff'd by an equally divided Court*, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970), the District of Columbia District Court declined to comment on a shipper's challenge to "certain rate increase orders of the ... Commission" because those orders, based on findings of general revenue need, were inherently unreviewable. Noting that the decision not to review was *not* a final decision on the merits of the shippers' claims, the court remarked,

> The foregoing [individual complaint procedure] ... assures any aggrieved party, such as the plaintiffs herein, the opportunity to challenge any particular rates which affect them under the procedures provided in ... [the Statute].

*Id.* at 338.

The same result was reached by the District Court of the Southern District of New York in *Atlantic City Electric Co. v. United States*, 306 F.Supp. 338 (S.D.N.Y.1969), *aff'd by an equally divided Court*, 400 U.S. 73, 91 S.Ct. 259, 27 L.Ed.2d 212 (1970). There, in finding another Commission general increase order based on general revenue need unreviewable, the Court said,

> And it is as true in this case as in the others that by pursuing their remedy in a Section 13 [11701] proceeding, plaintiffs and intervenors may achieve the relief that they are really seeking, i.e., a reduction in the particular rates on coal and grain and feed. This court cannot assume that the Commission will deny them relief nor can it relieve them from the necessity of seeking it because to do so may be time-consuming and expensive. In our opinion, this is what the statutory scheme requires.

*Id.* at 343.

In the instant case, it is clear that petitioners may challenge the Commission finding of general revenue need in complaint proceedings pursuant to 49 U.S.C. § 11701.[8] In conformance with *Alabama Power* and *Atlantic City*, we decline to discuss the general revenue need issue herein before such proceedings have yielded final Commission rulings on point.

---

**8.** 49 U.S.C. § 11701 provides:

(a) The Interstate Commerce Commission may begin an investigation under this subtitle on its own initiative or on complaint. If the Commission finds that a carrier or broker is violating this subtitle, the Commission shall take appropriate action to compel compliance with this subtitle. The Commission may take that action only after giving the carrier or broker notice of the investigation and an opportunity for a proceeding.

(b) A person, including a governmental authority, may file with the Commission a complaint about a violation of this subtitle by a carrier providing, or broker for, transportation or service subject to the jurisdiction of the Commission under this subtitle. The complaint must state the facts that are the subject of the violation and, if it is against a water carrier, must be made under oath. The Commission may dismiss a complaint it determines does not state reasonable grounds for investigation and action. However, the Commission may not dismiss a complaint made against a common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title because of the absence of direct damage to the complainant.

(c) A formal investigative proceeding begun by the Commission under subsection (a) of this section is dismissed automatically unless it is concluded by the Commission with administrative finality by the end of the 3d year after the date on which it was begun.

## C. The Ripeness Issue

This last point constitutes our final and broadest reason for not exercising jurisdiction over the Commission order at issue: none of the findings in that order are yet ripe for review. The finding of general revenue need, as well as other aspects of the order disagreeable to petitioners, may be challenged as suggested above in separate proceedings pursuant to the relevant sections of the Statute. Only when this administrative avenue has been exhausted will the Commission have issued a final decision on the merits of a particular allegation that may be reviewed by this Court. As we noted in *Council of Forest Industries, supra*, 570 F.2d at 1061,

> Since the ICC normally limits itself in general revenue proceedings to broader issues and expressly reserves judgment on whether any particular rate instituted under the general ceiling would be just and reasonable, the courts have concluded that the ICC's general action leaves questions about particular rates open to be determined in later proceedings focusing on individual applications of the general increase. Judicial review is held to be available only after the appropriate administrative remedies have been exhausted. (citations omitted)

While some petitioners have filed separate complaints with the Commission under Section 11701,[9] there have been no final Commission rulings therein. Thus, none of the complaints currently before the Court are ripe for review.

## CONCLUSION

For the foregoing reasons, we decline review of *Ex parte* No. 375 (Sub-No. 1) and of the allegations raised by petitioners concerning that order.

*Judgment accordingly.*

9. The following petitioners in No. 80–1761 have as of this time filed complaints as to rates on coal: Celanese Chemical Co. (ICC Docket Nos. 37640, 37641, and 38224); Arizona Electric Power Co. (Nos. 38378–38380).

The following members of petitioner in No. 80–2016, the Aluminum Association, Inc., have filed complaints: Alcoa (Nos. 37680–37726, 37759–37802, 37806, 37816, 37840, 37842–37845, 37858, 37859, 37861–37864, 37916, 37918–37922, 38006, and 38007); Anaconda (Nos. 37803, 37805); and Consolidated Aluminum Corp. (Nos. 37912–37915). The Association itself has also filed a complaint (No. 37466).

Petitioner in No. 80–2057, Kaiser Aluminum and Chemical Corporation, has also filed complaints (Nos. 37875–37878).