ARKANSAS POWER & LIGHT COMPA-
NY, System Fuels, Inc., Central Illinois
Light Company, Central Louisiana Elec-
tric Company, Nerco, Inc., Potomac
Electric Power Company, Public Service
Company of Indiana, Inc., South Caroli-
na Public Service Authority, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Carolina Power & Light Company, et al.,
Tampa Electric Company, Atchison,
Topeka and Santa Fe Railway Company,
et al., Western Coal Traffic League, Ne-
vada Power Company, Intervenors.

CAROLINA POWER & LIGHT COMPA-
NY, Duke Power Company, South Caro-
lina Electric & Gas Company, Virginia
Electric and Power Company, Tampa
Electric Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Western Coal Traffic League, Atchison,
Topeka and Santa Fe Railway Company,
et al., Nevada Power Company, Interve-
nors.

Nos. 82–2219, 82–2307.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 24, 1983.

Decided Jan. 10, 1984.

J. Raymond Clark, Washington, D.C., with whom Mary Todd Foldes, Washington, D.C., was on the brief, for petitioners in 82–2219.

John F. Donelan, Frederic L. Wood and John F. Donelan, Jr., Washington, D.C., were on the brief for Carolina Power & Light Co., et al., petitioners in 82–2307 and intervenors in 82–2219.

Evelyn G. Kitay, Atty., I.C.C., Washington D.C., with whom John Broadley, Gen. Counsel, I.C.C., Ellen D. Hanson, Associate Gen. Counsel, I.C.C., John J. Powers and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents in 82–2219 and 82–2307.

R. Eden Martin, Washington, D.C., with whom Joseph B. Tompkins, Jr., David M. Levy, Washington, D.C., Howard J. Trienens, New York City, Richard B. Allen, Chicago, Ill., Robert B. Batchelder, Omaha, Neb., Emried D. Cole, Jr., Louisville, Ky., John A. Daily, Philadelphia, Pa., and James L. Howe, III, Richmond, Va., were on the brief, for intervenors, Atchison, Topeka and Santa Fe R.C., et al., in 82–2219 and 82–2307. Paul A. Cunningham and Arthur W. Adelberg, Washington, D.C., also entered appearances for intervenors, Atchison, Topeka and Santa Fe R.C., et al.

James W. Lawson, Washington, D.C., was on the brief for intervenor, Nevada Power Co., in 82–2219 and 82–2307. Gloria M. Sodaro, Washington, D.C., also entered an appearance for intervenor, Nevada Power Co.

William L. Slover, C. Michael Loftus, Donald G. Avery and John H. LeSeur, Washington, D.C., were on the brief for intervenor, Western Coal Traffic League, in 82–2219 and 82–2307.

Before EDWARDS and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this action we are asked to review an agency's decision not to institute rulemaking, and to consider the reviewability—if any—of a policy statement announced, but not applied, in the adjudicatory proceeding currently before us.

Petitioners, a group largely made of coal-burning electric utilities ("the utilities"), challenge a decision and order of the Interstate Commerce Commission ("ICC") concerning rates that railroads may charge to captive shippers, such as the petitioners. The challenged order rejected the utilities' petition to institute a rulemaking proceeding and purported to set out ICC policy on implementation of the Long-Cannon Amendment to the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. The Long-Cannon Amendment specifies factors that the ICC should consider (a) in determining whether to investigate certain proposed rate increases, and (b) in evaluating

the reasonableness of certain rail rates. 49 U.S.C. § 10707a(e)(2)(B), (C) (Supp. V 1981).

For reasons set out below, we affirm the order of the ICC *solely* as it relates to the decision not to institute rulemaking. We decline to review the remaining portion of the decision, including its Policy Statement, because it addresses issues not actually before the ICC and is not ripe for judicial review at this time.

## I. BACKGROUND

In December 1981, Arkansas Power & Light Co. ("AP & L"), along with several other utilities, petitioned the ICC to institute a rulemaking proceeding. Specifically, they sought a determination of the kind of evidence that would be relevant to a Long-Cannon inquiry, the required production of such evidence from railroads nationwide, and the development of standards to be applied in carrying out the statutory requirements.[1] They argued that such a carrier-specific data base was a necessary prerequisite to compliance with the policy of the Staggers Act.[2] Petitioners also asserted that the ICC should halt the railroads' traditional differential pricing practices until the rulemaking was completed.[3]

Nine months later, after AP & L had instituted a court action to compel rulemaking, as authorized by 49 U.S.C. § 10326 (Supp. V 1981),[4] the ICC issued a decision refusing to institute the requested rulemaking proceeding. *Arkansas Power & Light Co., et al.—Petition to Institute Rulemaking Proceeding—Implementation of Long-Cannon Amendment to the Staggers Rail Act,* 365 I.C.C. 983 (1982). Instead, the ICC announced that the Long-Cannon factors set out at 49 U.S.C. § 10707a(e)(2)(B) and (C) would be considered through case-by-case adjudication. The ICC then proceeded to outline the burden of proof it intended to impose on carriers and shippers in proceedings implicating those factors. Petitioners appeal the ICC decision not to institute rulemaking.[5]

### A. The Statutory Scheme

We begin our inquiry with a sketch of the statutory scheme. The Railroad Revitaliza-

---

1. The terms of the statute are discussed in part I.A. *infra.*

2. The parties disagree as to the scope of the requested rulemaking. In their Reply Brief, petitioners Carolina Power & Light Co., *et al.,* apparently contend that AP & L sought only to have the ICC establish guidelines for developing information, implying that it did not request development of a nationwide data base. Reply Brief of Carolina Power & Light Co., p. 3–4; *see also* Brief of AP & L, p. 12. Quite to the contrary, we read the AP & L Petition, as did the ICC, to seek the collection of data on a regular, continuing basis. *See* Petition for Institution of Rulemaking Proceeding to Implement Provisions of 49 U.S.C. § 10707a(e)(2)(B) and (C) at 33, *reprinted in* Joint Appendix ("J.A.") 67. Indeed, we believe that is the admitted intent of AP & L. *See* Brief of AP & L in *Arkansas Power & Light Co. v. ICC & USA,* No. 82–1484 (D.C.Cir. dismissed as moot Sept. 8, 1983), p. 3.

3. The theory of differential pricing is that rates on some rail services must be set above full cost to compensate for services on which railroads are required to price below full cost to remain competitive.

4. Section 10326 provides, in pertinent part,

(b)(1) If a petition [for a rulemaking proceeding] is denied or action is not taken within the 120-day period under subsection (a) of this section, the petitioner may begin a civil action in an appropriate court of appeals of the United States for an order directing the Commission to begin a proceeding to take the action requested in the petition.

. . . .

(2) The court of appeals shall order the Commission to begin the action requested in the petition to the Commission if the court finds that the action requested in that petition is necessary and failure to take that action will result in the continuation of practices that are not consistent with the public interest or are not in accordance with this subtitle. The finding of the court must be based on a preponderance of the evidence in the record before the Commission or its delegate, or, if the civil action is based on a petition on which action was not taken, in a new proceeding before the court.

49 U.S.C. § 10326 (Supp. V 1981).

5. Petitioners invoke the power of this court under 49 U.S.C. § 10326, *see* note 4, *supra,* which authorizes the court of appeals to order the ICC to begin rulemaking in certain circumstances, and under 28 U.S.C. § 2321 (1976 & Supp. V 1981), governing judicial review of final ICC decisions.

tion and Regulatory Reform Act of 1976 ("4–R Act")[6] and the Staggers Rail Act of 1980[7] largely removed the nation's railroads from federal regulatory control in markets where free competition could ensure reasonable railroad rates and practices. The 4–R Act eliminated the jurisdiction of the ICC to find that a rate is unreasonably high unless the "proponent carrier" has "market dominance" over the relevant service. Pub.L. No. 94–210, § 202(b), 90 Stat. 31, 35 (codified as amended at 49 U.S.C. § 10709(c) (Supp. V 1981)). "Market dominance" was defined as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." *Id.* (codified as amended at 49 U.S.C. § 10709(a) (Supp. V 1981)). "The effect of this provision [limiting jurisdiction] was to end for most rail service decades of ICC control over maximum rates and to permit carriers not having market dominance to set rates in response to their perception of market conditions." *Bessemer & Lake Erie Railroad v. ICC,* 691 F.2d 1104, 1108 (3d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983); *see also Ford Motor Co. v. ICC,* 714 F.2d 1157, 1158–59 (D.C.Cir.1983). Congress then quantified the threshold market dominance test in the Staggers Act, establishing a presumption against market dominance where a rail carrier's revenues from the transportation at issue exceed variable cost by less than a designated percentage. *See* Pub.L. No. 96–448, § 202, 94 Stat. 1895, 1900 (codified at 49 U.S.C. § 10709(d) (Supp. V 1981)). Revenues equal to or greater than that percentage do not result in a presumption of market dominance but are to be examined individually. *Id.* Also in the Staggers Act, Congress created zones of rail carrier rate flexibility, in which even market dominant carriers may increase rates without ICC approval if the carriers' revenues are found to be inadequate. Pub.L. No. 96–448, § 203(a), 94 Stat. 1895, 1901–04 (codified at 49 U.S.C. § 10707a (Supp. V 1981)).

■ A rate subject to ICC jurisdiction may be challenged in either of two ways. Before the new rate goes into effect, the Commission may begin a proceeding, on its own initiative or on complaint of an interested party, to investigate the rate. 49 U.S.C. § 10707(a) (Supp. V 1981). After a rate goes into effect, the ICC may begin an investigation, on its own initiative or on complaint, into the reasonableness of the existing rate. 49 U.S.C. § 11701 (Supp. V 1981). An ICC decision to approve or disapprove rates, following an investigation, is a judicially reviewable final decision. *See Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 452, 99 S.Ct. 2388, 2393, 60 L.Ed.2d 1017 (1979). In contrast, the decision whether to investigate a proposed rate is generally, albeit not always, considered to be an unreviewable exercise of Commission discretion. *Southern Railway Co.,* 442 U.S. at 454–55, 99 S.Ct. at 2394–95.

The 4–R and Staggers Acts established that ICC jurisdiction should typically be preserved in situations of railroad market dominance, where effective competition is unavailable to limit the maximum level of rail rates charged captive shippers. The Long-Cannon Amendment was designed to give added protection to captive shippers. It was the result of Congress' concern about the extent to which rail carriers might use their monopoly traffic to subsidize other traffic that faced effective competition. While there was no need for strict equality in contributions made by different traffic segments, "the amendment sought to assure that rail rate flexibility would not result in [captive] shippers bearing a disproportionate share of responsibility for the needed improvement in the railroads' financial position." 365 I.C.C. at 988. *See also* 125 Cong.Rec. 36,422 (1979) ("rates on coal should not ... subsidize the continuation of antiquated and inefficient railroad practices") (remarks of Senator Long introducing original version of Long-Cannon Amendment); 126 Cong.Rec. 7264–67 (1980)

---

**6.** Pub.L. No. 94–210, 90 Stat. 31.

**7.** Pub.L. No. 96–448, 94 Stat. 1895.

(remarks of Senators Long, Cannon, Baucus & Bentsen).

Toward this end, the Long-Cannon Amendment specified certain factors that the ICC should consider in determining whether to investigate a proposed rate, and in evaluating the reasonableness of the rate. To trigger these factors, the rate must satisfy a threshold test of market dominance, set out at section 10707a(e)(2)(A).[8] The Long-Cannon market dominance test is more rigorous than the ICC's jurisdictional market dominance test set out at section 10709(d). If the rate meets the Long-Cannon criteria, "the Commission may, on its own initiative, or on complaint of an interested party, begin an investigation proceeding to determine whether the proposed rate increase violates" the subtitle. 49 U.S.C. § 10707a(e)(2)(A) (Supp. V 1981).

Unlike section 10707 of the Interstate Commerce Act, which authorizes the ICC to decide whether to investigate a rate and provides no standards to apply in making the decision, the Long-Cannon Amendment limits ICC discretion in this area, requiring that it consider certain factors in reaching its decision, and that it set out reasons for its decision. Similarly, the Amendment imposed new restraints on ICC rate reasonableness determinations, mandating that the ICC consider certain factors in reaching its conclusions.

*In determining whether to investigate* a proposed rate increase that meets the Long-Cannon threshold criteria, the Commission is directed to set forth reasons for its decision, giving due consideration to three factors:

(i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;

(ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and

(iii) the impact of the proposed rate or rate increase on the attainment of the national energy goals and the rail transportation policy under section 10101a of this title, taking into account the railroads' role as a primary source of energy transportation and the need for a sound rail transportation system in accordance with the revenue adequacy goals of section 10704 of this title.

49 U.S.C. § 10707a(e)(2)(B) (Supp. V 1981).[9]

*If the ICC decides to investigate* a rate, or evaluates the rate following the complaint of a shipper, the Commission is directed to consider evidence of the first two factors listed above, together with a third issue: whether one commodity is paying an unreasonable share of the carrier's overall revenues. 49 U.S.C. § 10707a(e)(2)(C) (Supp. V 1981).

The statute elsewhere establishes burdens of proof for shippers and carriers in rate reasonableness proceedings. In an investigation into the reasonableness of a rate brought by the ICC, the carrier bears the burden of proof. 49 U.S.C. § 10701a(b)(2)(B) (Supp. V 1981). In a complaint proceeding brought by a shipper, the shipper bears the burden of proof. 49 U.S.C. § 10701a(b)(2)(A) (Supp. V 1981). The statute does not impose any burden of production or proof on carriers or shippers regarding the ICC determination whether to investigate a proposed rate.

---

**8.** 49 U.S.C. § 10707a(e)(2)(A) (Supp. V 1981) authorizes the ICC to begin investigation proceedings, on its own initiative or on complaint of an interested party, to determine the reasonableness of a rate when the rate results in a revenue-variable cost percentage for the transportation to which the rate applies that is equal to or greater than—

(i) 20 percentage points above the revenue-variable cost percentage applicable in a year under 49 U.S.C. § 10709(d) (Supp. V 1981); or

(ii) a revenue-variable cost percentage of 190 percent, whichever is less.

**9.** A related statutory provision, referred to in § 10707a(e)(2)(B)(iii), requires that revenue levels be adequate to cover expenses, plus a reasonable return on capital, under "honest, economical and efficient management." 49 U.S.C. § 10704(a)(2) (Supp. V 1981).

## B. *The ICC Decision*

In August 1982, the Commission issued its response to AP & L's rulemaking petition. It declined to institute a rulemaking or to delay application of differential pricing, announcing instead that it would consider the Long-Cannon factors in individual rate cases. The ICC also described the manner in which the factors would be considered in future rate cases.

Addressing rulemaking, the ICC observed at the outset that Congress had not evinced any intent to require a rulemaking proceeding to implement the Long-Cannon Amendment, in contrast to other sections of the Staggers Act in which Congress has issued such directives regarding implementation.[10] In addition, the ICC observed that annual carrier-by-carrier or commodity-by-commodity elasticity studies—used to determine whether a carrier could improve its profitability on a given route by altering its pricing structure—would be inconsistent with the design of the Staggers Act to minimize the need for regulatory control. Rules and guidelines for gathering and applying a nationwide data base would also be difficult to develop, and the amount of information necessary to develop an avoidable loss data base would be "enormous and enormously difficult to gather." 365 I.C.C. at 991. Along with these negative ramifications of a rulemaking proceeding, the agency considered the positive aspects of case-by-case evolution of standards to apply in implementing the Long-Cannon Amendment. It concluded,

> making this assessment in individual cases is more productive and efficient than a rulemaking because it will avoid applying a massive reporting burden on carriers which are efficient. The carrier that prices its services optimally is less

likely to have its rates challenged, and, therefore, the necessity to examine the Long-Cannon factors will not arise in every case.

*Id.* at 993. Thus, the Commission determined, it would address the Long-Cannon factors in individual cases.[11]

The ICC then set forth a Policy Statement announcing the role the Long-Cannon Amendment would play in the individual ratemaking proceedings. It interpreted section 10707a(e)(2)(C)—requiring that Long-Cannon factors be utilized in rate reasonableness determinations—to require that the party who otherwise bears the burden of proof come forward with evidence relevant to the statutory factors. The Commission indicated that in an ICC-instituted investigation, the burden of proof, and therefore of production, rests on the carrier proponent; in complaint cases, the burden rests on the party challenging the rate. The ICC recognized that complainants usually do not possess specific information about railroads' traffic mix and pricing practices and promised to grant "reasonable discovery requests to enable the complainant to obtain from the rail carrier information relevant to the Long-Cannon factors." 365 I.C.C. at 997. The ICC noted that it operates under short deadlines for deciding rail cases—the statute imposes a 180-day limit subject to extension[12]—and that complainants would therefore have to make discovery requests as quickly and as narrowly as possible. The ICC also concluded that the language of section 10707a(e)(2)(C) did not require the Commission to develop evidence relevant to the Long-Cannon factors. It thus interpreted the statutory mandate to "consider . . . evidence of" the Long-Cannon factors as directing the par-

---

**10.** *See, e.g.,* Staggers Rail Act of 1980, Pub.L. No. 96–448, §§ 202–205, 94 Stat. 1895, 1900–06 (respectively codified at 49 U.S.C. §§ 10709(d), 10707a, 10731(e), and reprinted in 49 U.S.C. § 10701a note).

**11.** AP & L also argued that railroads have a significant amount of avoidable revenue loss that could be reduced through more effective management, and it sought a rulemaking to

determine which railroads are managed efficiently. The ICC rejected the argument that a rulemaking was necessary, suggesting that it would not undertake such an inquiry absent evidence that railroads have a significant amount of avoidable revenue loss that could be reduced by more efficient management.

**12.** 49 U.S.C. § 10327 (Supp. V 1981).

ties to submit evidence for the Commission's consideration.

Addressing section 10707a(e)(2)(B)—which requires that the Long-Cannon factors be considered in decisions whether to investigate proposed rates—the ICC announced that it would consider the factors only to the extent that parties present evidence on them. The Commission decision did not explain why the ICC need not generate its own evidence, or request parties to supply it, in order to give "due consideration" to the Long-Cannon factors. Nor did it respond to petitioners' contention that the time frame in which decisions to investigate proposed rates are rendered—a rate increase may be filed on 20 days' notice, and protests are due within 10 days, leaving 10 days to make the decision [13]—makes it infeasible for parties other than the railroads themselves to present data on the railroads' profitability.

Finally, the ICC denied as infeasible and undesirable the request of Nevada Power Company, and others, that the rulemaking petition be consolidated with another pending action.

Petitioners challenge the ICC decision, claiming that to apply the Long-Cannon Amendment in a meaningful way the ICC must conduct a rulemaking proceeding to develop data on the profitability of railroad traffic. In addition, they argue, the ICC should not be permitted to require that shippers develop profitability data in individual rate proceedings, because that information is in the exclusive knowledge and possession of the railroads.

## II. DISCUSSION

### A. The Rulemaking Petition

On three independent grounds, we affirm the Commission's decision not to engage in rulemaking.

■ *First.* The pertinent statute imposes a significant burden that petitioners must meet before this court will compel rulemaking.[14] Under 49 U.S.C. § 10326(b)(2) (Supp. V 1981),[15] before ordering a rulemaking proceeding a reviewing court must find, on the basis of the record before the agency, that the rulemaking requested is "necessary" and that "failure to take that action will result in the continuation of practices that are not consistent with the public interest or are not in accordance with this subtitle." We conclude that petitioners have not met that heavy burden here.

Initially, it is not unreasonable for the ICC to conclude that development of a nationwide data base is unnecessarily cumbersome—because it would require numerous railroads, operating both efficiently and inefficiently, to produce data that might never be used—and to conclude that case-by-case evolution of standards is most productive and efficient. We also agree that challenges to railroad rates present complex fact situations most feasibly dealt with on an individual basis, when "the Commission can weigh evidence presented that the carrier has not taken advantage of opportunities to merge, abandon, surcharge, or max-

---

13. Railroad rates resulting in an increased rate may be filed 20 days prior to their effective date, 49 U.S.C. § 10762(c)(3) (Supp. V 1981), and rates resulting in a rate decrease may be filed 10 days prior to their effective date. *Id.* The ICC may also reduce the interim period if cause exists. 49 U.S.C. § 10762(d)(1) (Supp. V 1981).

14. AP & L argues that the ICC's failure to act within 120 days—the statutory period for a response to a rulemaking petition—renders the Commission's subsequent decision a nullity, and the "failure to act" a reviewable action. Brief of Petitioner AP & L, pp. 26–28. We are not certain of the intended effect of this argu-

ment. The statute provides one and the same remedy for denials of a petition for rulemaking and for failures to act—a civil action to compel rulemaking if certain exigencies are demonstrated. Thus whether we review the action of the agency as a denial, or as a failure to act, is irrelevant in the case before us.

Also, to the extent that the petitioners' concern is with the binding effect of the Policy Statement accompanying the denial, the Government has acknowledged that the Policy Statement is not binding. *See* note 18, *infra.* Thus the impact of petitioners' distinction vanishes.

15. *See* note 4, *supra.*

imize the contribution of its other rates." 365 I.C.C. at 993. Finally, the ICC indicates that it will follow adequate procedures in the individual adjudications to enable petitioners, through discovery and otherwise, to obtain the kind of data they seek through rulemaking. Thus, the ICC has explained why rulemaking would be unnecessarily burdensome and how individual adjudications can and will accomplish the same result. Taking the ICC at its word, we perceive no necessity for rulemaking and are satisfied that the statutory burden of proof is not met.

■ *Second.* As a general proposition, this court will compel an agency to institute rulemaking proceedings only in extremely rare instances. The law in this Circuit makes clear that the scope of review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (1982), of an agency decision to deny a rulemaking petition is *very narrow.* Such review is limited to ensuring that the agency has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record. *See WWHT, Inc. v. FCC,* 656 F.2d 807, 817–18 (D.C.Cir.1981). Given this very narrow standard of review, there is absolutely no basis on this record to compel rulemaking.

■ *Third.* Under the APA, the case for deference to an agency's decision not to undertake rulemaking is even stronger when the alternative is not maintenance of the status quo but formulation of standards through case-by-case adjudication. It is well-established that the choice between rulemaking and case-by-case adjudication "lies primarily in the informed discretion of the administrative agency." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 293, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)). Where, as here, we find that the reasons offered by the agency for its choice constitute a sensible response to a new situation, we must defer to the agency's decision that adjudication best serves its purpose.

In reaching this conclusion, we are motivated not only by the soundness of the agency's inclination to avoid the unnecessary annual compilation of data from railroads whose rates will not foreseeably be challenged. We also are persuaded by the fact that Congress specified certain instances in which it expected the ICC to formulate standards within a given time frame [16] but left the means of implementation of other sections, including the Long-Cannon Amendment, to the ICC's discretion. We therefore affirm the agency's decision not to institute rulemaking pursuant to the petitioners' petition.

### B. *The Remaining Challenges*

■ We turn now to consider the remaining challenges to the ICC's decision. For reasons set out below, we conclude that the Policy Statement announced in that decision is not yet ripe for judicial review; consequently, we decline today to speculate about policies that have yet to be delineated in future adjudications, and we refuse to judge such policies when they have yet to be applied in concrete cases.

The parties before us have engaged in lengthy debate about the merits of the position that the ICC adopted in the so-called "Policy Statement" portion of its decision, concerning implementation of the Long-Cannon Amendment. Specifically, the petitioners challenge the ICC's remarks regarding the burdens of production and proof and the discovery rules that it intends to apply in investigation and complaint proceedings. The principal thrusts of petitioners' contentions are that they do not have access to data necessary to make allegations regarding the Long-Cannon factors, that the ICC is providing only limited discovery to remedy this problem, and that the ICC has made clear that unless data are submitted on the Long-Cannon factors, the Commission will not consider those factors at all.

---

**16.** *See* note 10, *supra.*

More specifically, the petitioners claim that the fact that the ICC may have to decide in as few as 20 days whether to investigate a proposed rate, see 49 U.S.C. § 10762(c)(3) (Supp. V 1981), makes it impossible for shippers to gather sufficient data to make a Long-Cannon showing. Whether this is true, the record does not make clear. However, the Commission implies in its Policy Statement that it will consider the factors at this stage only if presented with evidence on them by the parties. A plausible inference, urged upon us by petitioners, is that, if the railroads choose not to offer such evidence, and if the captive shippers are not able to gain access to data to make a showing within that time frame, the ICC will not consider the factors at all at this early stage. Similarly, petitioners argue that the limited discovery permitted them will hinder their ability to make a showing as to the Long-Cannon factors when the ICC inquires into the reasonableness of a rate, and that the ICC will not consider Long-Cannon factors at that stage, either, if no allegations are made.

But for the present posture of this case, we might find these contentions disturbing. Particularly in light of the clarity of the statutory mandate in section 10707a(e)(2)(B), *requiring* (1) consideration of the Long-Cannon factors and (2) enunciation of reasons, we can only assume that the ICC will follow the statute in deciding whether to investigate. In other words, the legislation makes clear that the Commission must consider the statutory factors, and we are chary to conclude that the Commission would construe it otherwise when confronted with an actual case. Similarly, the statute's unambiguous mandate in section 10707a(e)(2)(C), to consider the factors during the rate reasonableness inquiry, leads us to believe that the ICC will adhere to the language of the statute when required to do so.

Despite some questionable provisions in the Policy Statement (that arguably stand in contradiction to the relevant statutory mandates), we nonetheless decline to review the Policy Statement at this time, *i.e.*, prior to its application in a concrete situation before the court. We find it difficult to accept certain of petitioners' constructions of the ICC's Policy Statement, given how blatantly the suggested applications would flout the statutory language. At the same time, however, we have no idea how the ICC actually would respond to the various situations posed by petitioners. We need not set our imaginations to work, speculating on likely responses, however, because we need not pass judgment on the merits of possible applications of the Policy Statement. Established case law, coupled with the facts of this case, make clear that the Policy Statement is not properly before this court for review at this time.[17]

As the parties agreed at oral argument, the only issue actually before the Commission in the AP & L proceeding was the petitioners' request for a rulemaking. As a consequence, and as the parties also agree, the ICC's Policy Statement is nothing more than a *non-binding* statement of future intent.[18] To determine whether the Policy

---

**17.** The discussion that follows assumes that the ICC's statement is a general statement of policy, exempted from the notice-and-comment rulemaking procedures of the Administrative Procedure Act by § 553(b)(A). Clearly, if the Commission intended the statement to be a rule, of binding force, the rule is invalid. "[A]fter all, announcing a rule in an adjudication without applying it in the particular case is rulemaking, not adjudication, and § 553 prescribes a procedure for rulemaking." 2 K. Davis, Administrative Law Treatise § 7:25, at 124 (2d ed. 1979). *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (in which six Justices disapproved the NLRB's statement in an adjudicatory opinion

of a rule for prospective application). We would therefore decline to review the announced policy in that event, as well.

**18.** The following exchange, which occurred at oral argument in this case, manifests the Government's stance on this matter:

The Court: You can't have it both ways.... You can't say, "We're not going to have rulemaking because these things have to be developed case-by-case, and we have to see how it works, and we have to flesh it out," and then on the other hand come in with a 30-page document that looks like rules and tell the court you have to affirm all that and it binds everyone hereafter.

Statement is ripe for review at this time, we are, of course, guided by the Supreme Court's decision in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which taught,

> it is fair to say that [the ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–49, 87 S.Ct. at 1515–16. The Court then set out a methodology for determining whether a case is fit for review, stating that "[t]he problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515; *see also Continental Air Lines v. CAB,* 522 F.2d 107, 124–25 (D.C.Cir.1974) (en banc) (to warrant review, interests of court and agency in postponing review must be outweighed by interest of those seeking relief). Considered in light of the *Abbott Laboratories* standard, this Policy Statement is not currently ripe for judicial review.[19]

There can be no doubt that review would be most appropriate after the ICC applies its Policy Statement to concrete fact situations, "when the precise operation and impact" of its procedures are settled. *See Association of National Advertisers v. FTC,* 617 F.2d 611, 621 (D.C.Cir.1979). At this time we have before us no more than a broadly stated, tentative rule, issued without notice or opportunity for comment, whose aim is not to set legally binding norms but, we presume, to give advance notice of some general guidelines for investigation and adjudication. From the hesitant answers we received at oral argument in response to hypothetical inquiries about the application of the Policy Statement, we are convinced that the ICC has yet to determine how it will in fact proceed in Long-Cannon inquiries. We therefore have no idea how the ICC would react if, for example, captive shippers could not make a Long-Cannon showing at the initial stage when the ICC decides whether to investigate, as they claim. Nor have we any idea what kind of showing they realistically may be expected to make, or whether they really are at a loss to produce evidence in the 20-day time period between a rate's filing and effective date. As we have said once before, in a similar context, while "[i]t may be that this provision *will* unlawfully burden rights of parties to participate," *Association of National Advertisers v. FTC,* 617 F.2d 611, 621 (D.C.Cir.1979), "it is best for the judiciary to stay its hand until the provision in fact *does* result in the consequences appellants predict." *Id.; see also Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 48–49 (D.C.Cir.1974) (review premature when court has no assurance that announced policy will be applied in future proceedings). This case obviously raises precisely those concerns that *Abbott Laboratories* addressed, in requiring that judicial review involve concrete disputes over completed action, not abstract disputes over hypothetical governmental activities.

Nor would a decision to postpone review until the ICC's proposed policies are applied

---

Government: Oh, no, we are not saying that it binds everyone hereafter, Your Honor. The Court: So all the rest of that language in that decision, the Government does not contend is binding on anyone and may be raised in subsequent adjudications, right?
Government: Absolutely, Your Honor.

**19.** In a recent Supreme Court decision, *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981), the Court reviewed an FCC Policy Statement before it had been applied. The Court engaged in no discussion of ripeness. Were it necessary, we would find this case distinguishable, in that the Statement in *WNCN* was the product of notice-and-comment rulemaking and, therefore, while labeled the same as the Statement before us, could actually have been of legal force and effect. We do not believe, however, that *WNCN* should be read at this stage to undercut *Abbott Laboratories,* but simply to suggest that in that case the pragmatic considerations set out in *Abbott Laboratories* pointed in the direction of reviewability.

harm petitioners in any way. Non-intervention at this juncture creates no risk that rights will be prejudiced, because judicial review of the agency's procedures, including discovery and burdens of production and proof, will be available on appeal from individual adjudicatory proceedings. The parties agreed at oral argument [20] that if the Commission decides not to investigate a rate and gives reasons that ignore Long-Cannon considerations—the scenario petitioners urge upon us—that circumstance probably would create an exception to the customary view that decisions whether to investigate are nonreviewable, and would be susceptible to judicial review for flouting the plain language of the statute.[21] Also, the Commission's treatment of the Long-Cannon factors in rate reasonableness proceedings would be susceptible to judicial review on appeal from an adverse final ruling on the rate. Nor does our decision to defer consideration work a hardship on the parties. The policy poses no dilemma to shippers; they need not, for example, choose between disadvantageous compliance with a regulation and strong sanctions. *See Abbott Laboratories,* 387 U.S. at 152–54, 87 S.Ct. at 1517–18. The only conceivable hardship might be in the effort of making a showing, to the extent they can, against a proposed rate that they voluntarily have chosen to challenge.

Considering, on the one hand, the advantages of postponing review, and, on the other hand, the dearth of reasons to act otherwise, we hold that the Policy Statement is not ripe for review and decline to adjudicate it on the merits.

CONCLUSION

For the foregoing reasons, we affirm the ICC's denial of the utilities' rulemaking petition. We also postpone consideration of the ICC's announced policy regarding implementation of the Long-Cannon factors until the issues are presented in a concrete form better fit for judicial review.

*So ordered.*

---

**20.** At oral argument we asked whether the Commission could "go so far as to say we're not investigating anything and we think those Long-Cannon factors are ridiculous and we're not going to consider them in any event—we don't care whether they're proposed to us or not." The Government counsel responded, "I would say ... that could be reviewable as thwarting the plain language of the statute."

**21.** We note that § 10707a(e)(2)(B) states that the subparagraph "shall not be construed to change *existing law* with regard to the nonreviewability of such determination." (Emphasis added). Existing law prevents judicial scrutiny of the merits of a decision whether to investigate, *see Southern Ry. Co. v. Seaboard Allied*

*Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), and we in no way suggest that such review could follow a decision under this subparagraph. We construe this clause regarding nonreviewability to mean that courts cannot now review what they could not review before. It in no way suggests that a court cannot review for compliance with the statute's procedural requirements, which in this case means review to assure, first, that reasons are given, and second, that the Long-Cannon factors are considered. *See Southern Ry. Co.,* 442 U.S. at 455–56, 99 S.Ct. at 2394–95 (basing its holding of nonreviewability in part on the fact that the statute is silent on what factors should guide the Commission's decision).